SACCO & FILLAS, LLP
PATRICIA R. LYNCH (PRL-1030)
CLIFFORD TUCKER (CT-0206)
Attorneys for Plaintiffs
31-19 Newtown Ave., 7th Fl.
Astoria, NY 11102
Tel: (718) 746-3440

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TERENCE POLETTI, LEONARD COSTA, CHRISTOPHER J. CHAPMAN, STEVEN NIEVES, JOSEPH DISTASI, ARTHUR COMBS, MICHAEL ASHTON, LEONARD CARLO, KIRK RODRIGUEZ, STEVEN WEIDLER, MIGUEL MIELES, ROBERT ELISEO, VINCENT CARRIERI, ABRAHAN ROSARIO, MATTHEW DUNDIE, N. WILLIAM GOOD, JEFRREY GOOD, NICK PURCELL, ANGEL LOPEZ, GERARD AMITRANO, STEPHEN MARTIN, THOMAS CAPRIOLA, GEORGE MURN, THOMAS LEGOTTE, TERENCE CARR, TERENCE CARR II, MERYL WALDER AS THE EXECUTOR OF THE ESTATE OF ALAN WALDER, and DONNA MAGNUSSEN AS THE AS THE EXECUTOR OF THE ESTATE OF RICHARD MAGNUSSEN, on behalf of themselves and all others similarly situated, | Case No. 1:21-cv-7603 <br><br> **THIRD AMENDED COMPLAINT FLSA COLLECTIVE AND RULE 23 CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiff, | |
| -against- | |
| PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC., REGINALD GOINS, WILLIAM W. WILSON, HAROLD HONICKMAN, JEFFREY HONICKMAN, JOSEPH KLINGLER, SCOTT ALLMERS, and JOSEPH HAYES, | |
| Defendants. | |

Plaintiffs, TERENCE POLETTI, LEONARD COSTA, CHRISTOPHER J. CHAPMAN, STEVEN NIEVES, JOSEPH DISTASI, ARTHUR COMBS, MICHAEL ASHTON, LEONARD CARLO, KIRK RODRIGUEZ, STEVEN WEIDLER, MIGUEL MIELES, ROBERT ELISEO, VINCENT CARRIERI, ABRAHAN ROSARIO, MATTHEW DUNDIE, N. WILLIAM GOOD, JEFRREY GOOD, NICK PURCELL, ANGEL LOPEZ, GERARD AMITRANO, STEPHEN MARTIN, THOMAS CAPRIOLA, GEORGE MURN, THOMAS LEGOTTE, TERENCE CARR, TERENCE CARR II, MERYL WALDER AS THE EXECUTOR OF THE ESTATE OF ALAN WALDER, and DONNA MAGNUSSEN AS THE AS THE EXECUTOR OF THE ESTATE OF RICHARD MAGNUSSEN ("Plaintiffs"), by and through their attorneys, Sacco & Fillas, LLP, as and for their Amended Complaint against the Defendants, PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. ("PCBCNY"), REGINALD GOINS, WILLIAM W. WILSON, HAROLD HONICKMAN, JEFFREY HONICKMAN, JOSEPH KLINGLER, SCOTT ALLMERS, and JOSEPH HAYES (collectively "Defendants"), specifically allege and state as follows:

## I.   **INTRODUCTION**

1.      This action is brought by and on behalf of the above-named individual Plaintiffs, all of whom are current or former distributors[1] of PCBCNY non-alcoholic beverage products to various large and small retail and corporate accounts within the five boroughs of the City of New York, as against beverage giant PCBCNY and the above-named owners and members of its upper management team, each jointly and severally, and in their individual capacities (collectively, "Defendants").

---

[1] Defendants also had employees who distributed PCBNY products; however, all references to "distributor(s)," and "distributorship(s)" herein refer to Plaintiffs and distributors who were classified as "independent contractors" by Defendants, unless otherwise stated.

2.      PCBCNY supplies and distributes soft drinks throughout the five boroughs of New York City, Westchester County, and Nassau and Suffolk Counties. PCBCNY's products include well-known beverage lines such as Pepsi, Gatorade, Starbucks, Evian, Mountain Dew, Lipton, Aquafina, Pure Leaf Tea, and many others.

3.      PCBCNY's business model and long-term success depend upon the distribution and sale of its beverage products and brands to thousands of retail and corporate accounts in and around New York City and the surrounding counties ("customers"). Plaintiffs are distributors who work to sell and distribute PCBCNY products to customers.

4.      PCBCNY dictates and controls virtually every detail and aspect of Plaintiffs' day-to-day services and operations, scrutinizing and overseeing Plaintiffs' work at every level of the distribution process, from training, sales, marketing, pricing, and delivery to the stocking of shelves and product placement at each PCBCNY account.

5.      Plaintiffs' claims and damages in this action principally arise from, and seek redress for, Defendants' intentional and longstanding misclassification of Plaintiffs as "independent contractors," rather than "employees" of PCBCNY.

6.      Plaintiffs also seek relief for Defendants' other unlawful, heavy-handed, and oppressive policies and practices in violation of Plaintiffs' statutory and common law rights – which policies and practices have severely and unconscionably undermined and obstructed Plaintiffs' ability to earn a lawful wage, despite their generating millions of dollars in profits for PCBCNY and its management team along the way.

7.      Plaintiffs seek, *inter alia,* to be recognized and reclassified as employees of PCBCNY, with all of the attendant rights and privileges of employees under applicable federal and state law, to enjoin Defendants' unlawful practices going forward, and to recover from PCBCNY and the individual Defendants all appropriate compensatory damages, unpaid regular wages, overtime wages,

unlawful deductions and charges against earnings, as well as statutory compensatory and liquidated damages, attorney's fees, costs, and interest, for Defendants' past and ongoing unlawful acts and omissions.

8.      In addition, Plaintiffs also seek the costs and expenses of this action, including their attorneys' fees, costs, and interest consistent with their statutory rights under federal and state law.

## II.   JURISDICTION AND VENUE

9.      Plaintiffs, and members of the FLSA Collective and Class seek monetary damages and declaratory and injunctive relief pursuant to, *inter alia,* the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 201, *et seq.*); the United States Department of Labor, Wage and Hour Division's Regulations Relation to Labor, Title 29, Subtitle B, Ch. V, *et seq.* ("Federal Wage Regulations"); the New York Labor Law ("NYLL"), Article 6 (Payment of Wages), Article 19 (Minimum Wage Act), and the Regulations promulgated thereunder; and the Declaratory Judgment Act (28 U.S.C. § 2201). Plaintiffs also seek related relief pursuant to the common law of the State of New York.  In the unlikely event that Plaintiffs are deemed not to be employees of Defendants, Plaintiffs seek alternative statutory relief pursuant to the New York Franchise Act, New York General Business Law ("NYGBL") Art. 33 and accompanying regulations governing franchises (Title 13 NYCRR Part 200).

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (the provisions of the general jurisdictional statute for "civil actions arising under the ... laws ...of the United States") and the Declaratory Judgment Act, 28 U.S.C. § 2201.

11.     This Court has supplemental jurisdiction over the state claims arising pursuant to the statutory and common law of the State of New York, pursuant to 28 U.S.C. § 1367.

12.     Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (d).

13.     Defendant PCBCNY maintains its principal place of business within the State of New York, and it conducts substantial business within this judicial district.

14.     A substantial part of the events giving rise to the claims asserted herein occurred within this judicial district.

## III.    THE PARTIES

### A.    PLAINTIFFS

15.     Plaintiffs' primary job is to promote, sell, and distribute PCBCNY products to customers—i.e., retail businesses such as (for example) Rite Aid, Walgreens, supermarkets, and delis. Among Plaintiffs' several job responsibilities, they are also required to stock customers' shelves and refrigerators with PCBCNY products according to plans and diagrams established by PCBCNY and/or its customers and are sometimes required to build elaborate product displays in customers' stores for holidays.

16.     As a condition of obtaining employment, Plaintiffs must form or use a single purpose legal entity and to enter a lengthy form contract entitled a "Distributor Agreement." While the existence of a separate corporate entity gives the appearance of independence and separation from PCBCNY; in point of fact, the distributorship is wholly reliant upon PCBCNY and the Distributor Agreement for its existence and is not independent.

17.     Each Distributor Agreement determines the conditions of Plaintiffs' employment in virtually every area including but not limited to: the right to sell and distribute PCBCNY products; territories under the Plaintiffs' control; beverages available for distributors to sell; the Plaintiffs' obligations to meet standards of sales and service set by PCBCNY; attendance at meetings; proceeds and records of sales; equipment requirements; insurance requirements; use of PCBCNY symbols;

the Plaintiffs' image and reputation; dispute resolution; fees paid to PCBCNY; transfers of ownership of the Plaintiffs' distributorship; terminations of the Distributor Agreement; options for PCBCNY to purchase the Plaintiffs' distributorship; Plaintiffs' annual certifications; e-commerce commissions paid to distributors; commission rates paid, wages paid; the method by which commissions are calculated; sales promotions; transfers; and other areas of the relationship.

18.     In addition to signing the Distributor Agreement, Plaintiffs must "purchase" a PCBCNY route (a geographic territory) by, among other things, executing a Distributor Agreement, providing cash or other consideration in the form of promissory notes, transfer fees, and personal guarantees – all purportedly in exchange for the "exclusive" right and privilege of working for Defendants, by servicing certain PCBCNY customers, for the ultimate benefit of Defendants.

19.     Although each Distributor Agreement contains various statements and language purporting to classify Plaintiffs as "independent agents," this classification fails to account for the economic realities of the relationship.

20.     Before approximately December 23, 2020, each Plaintiff operated a distributorship through a "Former Agreement."

21.     On or about December 23, 2020, Defendants issued a "New Agreement" to Plaintiffs

22.     After December 23, 2020, the Former Agreement was terminated.  The effect of terminating the Former Agreement was to ultimately terminate Plaintiffs operating under the Former Agreement within approximately five years of the notice of termination.

23.     The New Agreement made material changes to conditions of employment for the Plaintiffs who signed it in the areas of loading procedures, commission payments, and the price for which the distributorship(s) could be sold, among a myriad of other areas.

24.     Each Plaintiff's primary duty is to perform manual work, including lifting, bending, loading PCBCNY products, unloading products, hauling products using hand devices such as hand carts, carrying products, kneeling for extended periods, and stocking PCBCNY products.

25.     Plaintiffs perform work involved repetitive operations with their hands that requires physical skill and energy.

26.     Plaintiffs were not paid time-and-a-half for each hour more than forty (40) hours worked per week.

27.     Plaintiffs were paid wages in the form of commissions which were determined based on several factors including: the language in the Distributor Agreement (whether the Former Agreement or New Agreement); designations by the parties; types of products delivered; type of customers receiving the products; and cost of products.

28.     In the ordinary course of business, PCBCNY maintains data, documents and/or records, akin to employment records, which state and calculate the amounts of commissions paid, and unpaid, per Plaintiff.  The use of said data and/or documents would allow for calculation of the commissions paid and owed to Plaintiffs and provides notice of potential overtime that would be owed to Plaintiffs.  Similarly, in the ordinary course of business, Defendant PCBCNY maintained, and upon information and belief maintains, a computer system (called "Margin Minder") which contains each Plaintiff's sales statistics evaluate potential customers and to evaluate Plaintiffs' "business."

29.     As a further result of this misclassifying Plaintiffs as "independent contractors," Defendants and PCBCNY could foist the costs and obligations associated with the employment relationship onto Plaintiffs.  Defendants improperly saddled Plaintiffs with the significant costs and expenses of conducting PCBCNY's business and servicing the PCBCNY accounts in the five boroughs – including but not limited to the expense of purchasing, repairing, and maintaining

trucks; paying for tolls; purchasing uniforms; bearing the expenses of transporting spoilage, broken, defective and/or expired products; paying refrigeration/vending fees; the cost of marketing efforts; and many other expenses that have been improperly charged to Plaintiffs by PCBCNY – notwithstanding that these expenses are incurred solely for PCBCNY's benefit, in the furtherance of its business model and its multi-million dollar commercial enterprise.

30.     When PCBCNY products broke or expired in customers' possession, Plaintiffs were paid no commission wages for their work in first having brought products to the customer and then transporting it back from the customer to PCBCNY facilities.  After having made two trips, which includes stocking and loading, Plaintiffs were paid no commission wages for their work associated with broken and/or spoiled products.  Defendants could deduct commissions for broken or spoiled products from Plaintiffs' product bills or simply refuse to pay commissions for broken or spoiled products.  Upon information and belief, PCBCNY maintains comprehensive documents or data that would allow calculation of the amount of broken and spoiled products which Plaintiffs were required to transport, twice, for no pay.   After having done twice the work of a typical delivery, Plaintiff was paid no commission.

31.     Similarly, upon information and belief, PCBCNY had power to deduct amounts from commissions when customers misapplied discount labels in their stores.  After having sold and delivered PCBCNY products, Plaintiffs are, at times, required to apply discount labels to store shelves, e.g., "3 bottles for $5."  Should the label be removed, PCBCNY had the authority to deduct amounts from Plaintiffs' commissions.

32.     Plaintiffs were likewise required to bear the costs of leasing and maintaining coolers and refrigerators to customers.  Upon information and belief, such amounts are in records within Defendants' possession and accessible in the ordinary course of Defendants' business.

i.   **TERENCE POLETTI**

33.    Plaintiff TERENCE POLETTI is an individual over the age of 18 years old and a resident of New York.

34.    TERENCE POLETTI has worked full-time as a distributor for Defendants from 1987 until present.

35.    Over the course of his employment with Defendants, TERENCE POLETTI regularly worked full-time for Defendant PCBCNY and the individually named Defendants for more than forty (40) hours per week.

36.    From approximately August 15, 2015, to the present, TERENCE POLETTI regularly worked Monday through Friday starting at approximately 5:00 AM. On Mondays, TERENCE POLETTI finished work at approximately 6:30 PM; on Tuesdays, TERENCE POLETTI finished work at approximately 5:30 PM; on Wednesdays, TERENCE POLETTI finished work at approximately 6:00 PM; on Thursdays, TERENCE POLETTI finished work at approximately 6:00 PM; and on Fridays, TERENCE POLETTI finished work at approximately 3:00 PM, which totals approximately sixty-two (62) hours per week.

37.    When Plaintiff TERENCE POLETTI had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021, he was not paid commission wages in the following respective approximate amounts: $488.80; $504.25; $520.00; $535.60; $551.20; $566.80; and $585.00.

ii.   **LEONARD COSTA**

38.    Plaintiff LEONARD COSTA is an individual over the age of 18 years old and a resident of New York.

39.    LEONARD COSTA has worked full-time as a distributor for Defendants from 1977 until present.

40.     LEONARD COSTA personally serviced Defendants' accounts.

41.     Over the course of his employment with Defendants, LEONARD COSTA regularly worked full-time for PCBCNY and the individually named Defendants for over forty (40) hours per week.

42.     LEONARD COSTA worked for Defendants from before August 30, 2015, to the present.

43.     From August 30, 2015, to the present, LEONARD COSTA regularly worked Monday through Friday starting at approximately 4:30 AM. On Mondays, LEONARD COSTA finished work at approximately 8:30 PM; on Tuesdays and Wednesdays, LEONARD COSTA finished work at approximately 9:00 PM; on Thursdays, LEONARD COSTA finished work at approximately 9:30 PM; and on Fridays, LEONARD COSTA finished work at approximately 8:30 PM, which totals approximately eighty-two (82) hours per week.

44.     When Plaintiff LEONARD COSTA had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $1,075.36; $1,109.68; $1,144.00; $1,178.32; $1,212.64; $1,246.96; $1,287.00.

### iii.   **CHRISTOPHER CHAPMAN**

45.     Plaintiff CHRISTOPHER CHAPMAN is an individual over the age of 18 years old and a resident of New York.

46.     CHRISTOPHER CHAPMAN has worked full-time as a PCBCNY distributor for more than six years until approximately on or about June or July 21, 2021.

47.     Before approximately June or July 21, 2021, CHRISTOPHER CHAPMAN personally serviced Defendants' accounts.

10

48.     Over the course of his employment with Defendants, CHRISTOPHER CHAPMAN regularly worked full- time for PCBCNY and the individually named Defendants for over forty (40) hours per week.

49.     From approximately August 2015 to approximately June or July 21, 2021, CHRISTOPHER CHAPMAN worked Monday through Friday from approximately 4:00 AM until approximately 10:00 pm to 11:00 PM, which totals approximately ninety (90) to ninety-five (95) hours per week.

50.     When Plaintiff CHRISTOPHER CHAPMAN had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $977.60; $1,008.80; $1,040.00; $1,074.20; $102.40; $1,133.60; $1,170.00.

### iv.   STEVEN NIEVES

51.     Plaintiff STEVEN NIEVES is an individual over the age of 18 years old and a resident of New York.

52.     STEVEN NIEVES has worked for Defendants since before August 30, 2015, to the present.

53.     Over the course of his employment with Defendants, STEVEN NIEVES regularly worked full-time for Defendants over forty (40) hours per week.

54.     From August 30, 2015, to May 28, 2021, STEVEN NIEVES worked Monday through Friday starting at approximately 6:00 AM and finishing work at approximately 10:00 PM, which totals approximately eighty (80) hours per week.

55.     From June 1, 2021, to the present, STEVEN NIEVES worked approximately twenty (20) hours per week.

56. When Plaintiff STEVEN NIEVES had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $684.32; $706.16; $728.80; $749.80; $771.68; $793.52; $819.00.

**v.** **JOSEPH DISTASI**

57. Plaintiff JOSEPH DISTASI is an individual over the age of 18 years old and a resident of New York.

58. JOSEPH DISTASI has worked for Defendants from approximately August 1, 1977, to the present.

59. From approximately August 30, 2015, to the present, JOSEPH DISTASI worked Monday through Friday starting at approximately 5:00 AM and finished work at approximately 3:00 PM, which totals approximately fifty (50) hours per week.

60. When Plaintiff JOSEPH DISTASI had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2,444.00; $2,522.00; $2,600.00; $2,678.00; $2,756.00; $2,834.00; $2,925.00.

**vi.** **ARTHUR COMBS**

61. Plaintiff ARTHUR COMBS is an individual over the age of 18 years old and a resident of New York.

62. ARTHUR COMBS has worked full-time as a PCBCNY distributor from approximately 1987 until present.

63. ARTHUR COMBS personally services PCBCNY accounts.

64. Over the course of his employment with Defendants, ARTHUR COMBS regularly worked full-time for Defendants for over forty (40) hours per week.

12

65.     From August 15, 2015, to the present, ARTHUR COMBS regularly worked Monday through Friday starting at approximately 5:00 AM. On Mondays, ARTHUR COMBS finished work at approximately 6:30 PM; on Tuesdays, ARTHUR COMBS finished work at approximately 5:30 PM; on Wednesdays, ARTHUR COMBS finished work at approximately 6:00 PM; on Thursdays, ARTHUR COMBS finished work at approximately 6:00 PM; and on Fridays, ARTHUR COMBS finished work at approximately 3:00 PM, which totals approximately sixty-two (62) hours per week.

66.     When Plaintiff ARTHUR COMBS had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $488.80; $504.25; $520.00; $535.60; $551.20; $566.80; $585.00.

**vii.     MICHAEL ASHTON**

67.     Plaintiff MICHAEL ASHTON is an individual over the age of 18 years old and a resident of New York.

68.     MICHAEL ASHTON has worked full-time as a distributor for Defendants from approximately 2002 until present.

69.     MICHAEL ASHTON personally services Defendants' accounts.

70.     Over the course of his employment with Defendants, MICHAEL ASHTON regularly worked full-time for Defendants for over forty (40) hours per week.

71.     From approximately August 2015 to approximately March 2021, MICHAEL ASHTON worked Tuesday through Saturday. On Tuesdays and Wednesdays, MICHAEL ASHTON started work at approximately 5:00 to 6:00 AM and finished work at approximately 7:30 to 8:00 PM; on Thursdays, MICHAEL ASHTON worked from approximately 5:00 AM to 6:00 AM to approximately 4:30 PM to 5:30 PM; on Fridays, MICHAEL ASHTON worked from approximately 5:00 AM to approximately 5:00 PM; and on Saturdays, MICHAEL ASHTON worked

from approximately 5:30 AM to 6:00 AM to approximately 1:30 PM to 2:00 PM, which totals approximately to 55.5 to 60.5 hours per week.

72.     From Approximately March 2021 to the present, MICHAEL ASHTON worked Mondays through Fridays. On Mondays, MICHAEL ASHTON worked from approximately 5:00 AM to approximately 6:00 PM; on Tuesdays and Wednesdays, MICHAEL ASHTON started work at approximately 5:00 to 6:00 AM and finished work at approximately 7:30 to 8:00 PM; on Thursdays, MICHAEL ASHTON worked from approximately 5:00 AM to 6:00 AM to approximately 4:30 PM to 5:30 PM; on Fridays, MICHAEL ASHTON worked from approximately 5:00 AM to approximately 5:00 PM, which totals approximately to 62.5 to 67.5 hours per week.

73.     When Plaintiff MICHAEL ASHTON had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $488.80; $504.40; $520.80; $535.60; $557.20; $566.80; $585.00.

**viii.   LEONARD CARLO**

74.     Plaintiff LEONARD CARLO is an individual over the age of 18 years old and a resident of New York.

75.     LEONARD CARLO has worked full-time as a distributor for Defendants from approximately 1988 until present.

76.     LEONARD CARLO personally services Defendants' accounts.

77.     Over the course of his employment with Defendants, LEONARD CARLO regularly worked full-time for Defendants for over forty (40) hours per week.

78.     From approximately January 1, 1988, to approximately to the present, LEONARD CARLO worked Monday through Friday. LEONARD CARLO started work at approximately 4:00

AM and finished work at approximately 4:00 PM; which totals approximately to 55.5 to 60.5 hours per week.

79.     When Plaintiff LEONARD CARLO had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $977.60; $1,008.80; $1,040.00; $1,071.00; $1,102.40; $1,133.60; $1,170.00.

    ix.   **KIRK RODRIGUEZ**

80.     Plaintiff KIRK RODRIGUEZ is an individual over the age of 18 years old and a resident of New York.

81.     KIRK RODRIGUEZ has worked full-time as a distributor for Defendants from approximately 1996 until present.

82.     KIRK RODRIGUEZ personally services Defendants' accounts.

83.     Over the course of his employment with Defendants, KIRK RODRIGUEZ regularly worked full- time for Defendants for over forty (40) hours per week.

84.     From approximately November 1, 1996, to approximately to the present, KIRK RODRIGUEZ worked Monday through Saturday. KIRK RODRIGUEZ started work at approximately 4:00 AM and finished work at approximately 8:00 PM; which totals approximately to 80 to 96 hours per week.

85.     When Plaintiff KIRK RODRIGUEZ had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2,737.28; $2,824.64; $2,912.00; $2,999.36; $3,174.08; $3,276.00.

### x. **STEVEN WEIDLER**

86.     Plaintiff STEVEN WEIDLER is an individual over the age of 18 years old and a resident of New York.

87.     STEVEN WEIDLER has worked full-time as a distributor for Defendants from approximately 2003 until present.

88.     STEVEN WEIDLER personally services Defendants' accounts.

89.     Over the course of his employment with Defendants, STEVEN WEIDLER regularly worked full- time for Defendants for over forty (40) hours per week.

90.     From approximately September 1, 2003, to approximately to the present, STEVEN WEIDLER worked Monday through Saturday. STEVEN WEIDLER started work at approximately 6:00 AM and finished work at approximately 5:00 PM; which totals approximately to 60 to 66 hours per week.

91.     When Plaintiff STEVEN WEIDLER had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $1,955.20; $2,017.60; $2,080.00; $2,142.40; $1,204.80; $2,267.20; $2,340.00.

### xi. **MIGUEL MIELES**

92.     Plaintiff MIGUEL MIELES is an individual over the age of 18 years old and a resident of New York.

93.     MIGUEL MIELES has worked full-time as a distributor for Defendants from approximately 1990 until present.

94.     MIGUEL MIELES personally services Defendants' accounts.

95.     Over the course of his employment with Defendants, MIGUEL MIELES regularly worked full-time for Defendants for over forty (40) hours per week.

16

96.     From approximately August 30, 1990, to approximately to the present, MIGUEL MIELES worked Monday through Thursday. MIGUEL MIELES started work at approximately 4:45 AM and finished work at approximately 6:30-7:00 PM; which totals approximately to 55 to 58 hours per week.

97.     When Plaintiff MIGUEL MIELES had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $782.08; $807.04; $832.00; $856.96; $884.92; $908.88; $936.00.

**xii.   ROBERTO ELISEO**

98.     Plaintiff ROBERT ELISEO is an individual over the age of 18 years old and a resident of New Jersey.

99.     ROBERT ELISEO has worked full-time as a distributor for Defendants from approximately 1986 until present.

100.    ROBERT ELISEO personally services Defendants' accounts.

101.    Over the course of his employment with Defendants, ROBERT ELISEO regularly worked full-time for Defendants for over forty (40) hours per week.

102.    From approximately August 25, 1986, to approximately to the present, ROBERT ELISEO worked Monday through Sunday. ROBERT ELISEO started work at approximately 5:00 AM and finished work at approximately 7:00 PM; which totals approximately to 65 to 96 per week.

103.    When Plaintiff ROBERT ELISEO had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2444.00; $2522.00; $2600.00; $2678.00; $2756.00; $2834.00; 2925.00.

xiii.   **VINCENT CARRIERI**

104.   Plaintiff VINCENT CARRIERI is an individual over the age of 18 years old and a resident of New York.

105.   VINCENT CARRIERI has worked full-time as a distributor for Defendants from approximately 2005 until present.

106.   VINCENT CARRIERI personally services Defendants' accounts.

107.   Over the course of his employment with Defendants, VINCENT CARRIERI regularly worked full- time for Defendants for over forty (40) hours per week.

108.   From approximately July 1, 2005, to approximately to the present, VINCENT CARRIERI worked Monday through Saturday. VINCENT CARRIERI started work at approximately 6:00 AM and finished work at approximately 4:00 PM; which totals approximately to 50 to 60 hours per week.

109.   In 2015, Plaintiff VINCENT CARRIERI was paid approximately $7,140.35 per week in gross but had to pay approximately $6,069.29 per week to Defendants for products and thus received approximately $1,071.06 per week in gross.

110.   When Plaintiff VINCENT CARRIERI had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $1,466.40; $1,513.20; $1,560.20; $1,606.80; $1,683.60; $1,700.00; $1,755.00.

xiv.   **ABRAHAM ROSARIO**

111.   Plaintiff ABRAHAM ROSARIO is an individual over the age of 18 years old and a resident of New Jersey.

112.   ABRAHAM ROSARIO has worked full-time as a distributor for Defendants from approximately 2006 until present.

113.    ABRAHAM ROSARIO personally services Defendants' accounts.

114.    Over the course of his employment with Defendants, ABRAHAM ROSARIO regularly worked full- time for Defendants for over forty (40) hours per week.

115.    From approximately 2015, to approximately to the present, ABRAHAM ROSARIO worked Monday through Friday. ABRAHAM ROSARIO started work at approximately 5:30 AM and finished work at approximately 4:00 PM; which totals approximately to 50 to 58 hours per week.

116.    When Plaintiff ABRAHAM ROSARIO had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $586.56; $605.28; $624.00; $642.72; $661.44; $680.16; $702.00.

xv.    **MATTHEW DUNDIE**

117.    Plaintiff MATTHEW DUNDIE is an individual over the age of 18 years old and a resident of Connecticut.

118.    MATTHEW DUNDIE has worked full-time as a distributor for Defendants from approximately 1998 until present.

119.    MATTHEW DUNDIE personally services Defendants' accounts.

120.    Over the course of his employment with Defendants, MATTHEW DUNDIE regularly worked full- time for Defendants for over forty (40) hours per week.

121.    From approximately March 27, 1998, to approximately to the present, MATTHEW DUNDIE worked Monday through Thursday. MATTHEW DUNDIE started work at approximately 3:30 AM and finished work at approximately 4:00 PM; which totals approximately to 48 to 51 hours per week.

122.    When Plaintiff MATTHEW DUNDIE had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020,

19

and 2021 he was not paid commission wages in the following respective approximate amounts: $586.56; $605.28; $624.00; $642.00; $66.44; $680.16; $702.00.

    **xvi.**    <u>**N. WILLIAM GOOD**</u>

123.     Plaintiff N. WILLIAM GOOD is an individual over the age of 18 years old and a resident of New York.

124.     N. WILLIAM GOOD has worked full-time as a distributor for Defendants from approximately 1988 until present.

125.     N. WILLIAM GOOD personally services Defendants' accounts.

126.     Over the course of his employment with Defendants, N. WILLIAM GOOD regularly worked full- time for Defendants for over forty (40) hours per week.

127.     From approximately June 1, 1988, to approximately to the present, N. WILLIAM GOOD worked Monday through Thursday. N. WILLIAM GOOD started work at approximately 8:00 AM and finished work at approximately 11:00 PM; which totals approximately to 60 hours per week.

128.     When Plaintiff N. WILLIAM GOOD had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $684.32; $706.16; $728.00; $749.80; $771.68; $793.52; $819.40.

    **xvii.**    <u>**JEFFREY GOOD**</u>

129.     Plaintiff JEFFREY GOOD is an individual over the age of 18 years old and a resident of New York.

130.     JEFFREY GOOD has worked full-time as a distributor for Defendants from approximately 2013 until present.

131.     JEFFREY GOOD personally services Defendants' accounts.

132.   Over the course of his employment with Defendants, JEFFREY GOOD regularly worked full- time for Defendants for over forty (40) hours per week. From approximately June 1, 2013, to approximately to the present, JEFFREY GOOD worked Monday through Saturday. JEFFREY GOOD started work at approximately 5:00 AM and finished work at approximately 6:00 PM; which totals approximately to 65 to 78 hours per week.

133.   When Plaintiff JEFFREY GOOD had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $684.32; $706.16; $728.00; $749.80; $771.68; $793.52; $819.40.

**xviii.   NICK PURCELL**

134.   Plaintiff NICK PURCELL is an individual over the age of 18 years old and a resident of New York.

135.   Plaintiff NICK PURCELL has worked full-time as a distributor for Defendants from approximately 1995 until present.

136.   Plaintiff NICK PURCELL personally services Defendants' accounts.

137.   Over the course of his employment with Defendants, NICK PURCELL regularly worked full- time for Defendants for over forty (40) hours per week.

138.   From approximately April 1, 1995, to approximately to the present, NICK PURCELL worked Monday through Friday.  Plaintiff NICK PURCELL started work at approximately 4:45 AM and finished work at approximately 2:00 PM; which totals approximately to 47 to 50 hours per week.

139.   When Plaintiff NICK PURCELL had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020,

and 2021 he was not paid commission wages in the following respective approximate amounts: $488.80; $504.40; $420.00; $535.60; $537.00; $566.80; $585.00.

     **xix.**  **ANGEL LOPEZ**

     140.    Plaintiff ANGEL LOPEZ is an individual over the age of 18 years old and a resident of New York.

     141.    ANGEL LOPEZ has worked full-time as a distributor for Defendants from approximately 2004 until present.

     142.    ANGEL LOPEZ personally services Defendants' accounts.

     143.    Over the course of his employment with Defendants, ANGEL LOPEZ regularly worked full- time for Defendants for over forty (40) hours per week.

     144.    From approximately December 17, 2004, to approximately to the present, ANGEL LOPEZ worked Monday through Thursday.  ANGEL LOPEZ started work at approximately 6:00 AM and finished work at approximately 3:00 PM; which totals approximately to 36 to 45 hours per week.  On instances when Plaintiff ANGEL LOPEZ worked weekends, Plaintiff ANGEL LOPEZ worked approximately 49 to 50 hours per week.

     145.    When Plaintiff ANGEL LOPEZ had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2,932.80; $3,026.40; $3,120.00; $3,307.20; $3,400.80; and $3,510.00.

     **xx.**  **GERARD AMITRANO**

     146.    Plaintiff GERARD AMITRANO is an individual over the age of 18 years old and a resident of New York.

     147.    GERARD AMITRANO has worked full-time as a distributor for Defendants from approximately 1992 until present.

148.     GERARD AMITRANO personally services Defendants' accounts.

149.     Over the course of his employment with Defendants, GERARD AMITRANO regularly worked full- time for Defendants for over forty (40) hours per week.

150.     From approximately June 1, 1992, to approximately to the present, GERARD AMITRANO worked Monday through Friday. GERARD AMITRANO started work at approximately 4:00 AM and finished work at approximately 2:00 PM; which totals approximately to 50 hours per week.

151.     When Plaintiff GERARD AMITRANO had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $977.60; $1,008.50; $1,040.00; $1,071.20; $1,102.40; $1,133.60; and $1,170.00.

**xxi.     STEPHEN MARTIN**

152.     Plaintiff STEPHEN MARTIN is an individual over the age of 18 years old and a resident of New York.

153.     STEPHEN MARTIN has worked full-time as a distributor for Defendants from approximately 1986 until present.

154.     STEPHEN MARTIN personally services Defendants' accounts.

155.     Over the course of his employment with Defendants, STEPHEN MARTIN regularly worked full- time for Defendants for over forty (40) hours per week.

156.     From approximately October 1, 1986, to approximately to the present, STEPHEN MARTIN worked Monday through Friday. STEPHEN MARTIN started work at approximately 6:00 AM and finished work at approximately 3:00 PM; which totals approximately to 45 hours per week.

157.     When Plaintiff STEPHEN MARTIN had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $684.32; $706.16; $728.00; $749.80; $771.68; 79..52; $819.00.

**xxii.     THOMAS CAPRIOLA**

158.     Plaintiff THOMAS CAPRIOLA is an individual over the age of 18 years old and a resident of New York.

159.     THOMAS CAPRIOLA has worked full-time as a distributor for Defendants from approximately 1978 until present.

160.     THOMAS CAPRIOLA personally services Defendants' accounts.

161.     Over the course of his employment with Defendants, THOMAS CAPRIOLA regularly worked full- time for Defendants for over forty (40) hours per week.

162.     From approximately July 1, 1978, to approximately to the present, THOMAS CAPRIOLA worked Monday through Friday. THOMAS CAPRIOLA started work at approximately 5:00 AM and finished work at approximately 8:00 PM; which totals approximately to 60 to 75 hours per week.

163.     When Plaintiff THOMAS CAPRIOLA had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2,444.00; $2,522.00; $2,600.00; $2,678.00; $2,756.00; $2,834.00; $2,925.00.

**xxiii.     GEORGE MURN**

164.     Plaintiff GEORGE MURN is an individual over the age of 18 years old and a resident of New York.

165. GEORGE MURN has worked full-time as a distributor for Defendants from approximately 1983 until present.

166. GEORGE MURN personally services Defendants' accounts.

167. Over the course of his employment with Defendants, GEORGE MURN regularly worked full-time for Defendants for over forty (40) hours per week.

168. From approximately June 1, 1983, to approximately to the present, GEORGE MURN worked Monday through Sunday. GEORGE MURN started work at approximately 6:00 AM and finished work at approximately 7:00 PM; which totals approximately to 70 to 91 hours per week.

169. When Plaintiff GEORGE MURN had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $2,932.80; $3,025.50; $3,120.00; $3,213.60; $3,307.20; $3,400.80; $3,510.00.

xxiv. **THOMAS LEGOTTE**

170. Plaintiff THOMAS LEGOTTE is an individual over the age of 18 years old and a resident of New York.

171. THOMAS LEGOTTE has worked full-time as a distributor for Defendants from approximately 1988 until present.

172. THOMAS LEGOTTE personally services Defendants' accounts.

173. Over the course of his employment with Defendants, THOMAS LEGOTTE regularly worked full- time for Defendants for over forty (40) hours per week.

174. From approximately August 8, 1988, to approximately to the present, THOMAS LEGOTTE worked Monday through Friday. THOMAS LEGOTTE started work at approximately

5:00 AM and finished work at approximately 6:00 PM; which totals approximately to 65 to 70 hours per week.

175.    When Plaintiff THOMAS LEGOTTE had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $977.60; $1,008.80; $1,040.00; $1,071.00; $1,102.40; $1,133.60; $1,170.00.

    **xxv.    TERENCE CARR**

176.    Plaintiff TERENCE CARR is an individual over the age of 18 years old and a resident of New Jersey.

177.    TERENCE CARR has worked full-time as a distributor for Defendants from approximately 1990 until present.

178.    TERENCE CARR personally services Defendants' accounts.

179.    Over the course of his employment with Defendants, TERENCE CARR regularly worked full-time for Defendants for over forty (40) hours per week.

180.    From approximately November 1, 2003, to approximately to January 4th, 2021, TERENCE CARR worked Monday through Friday. TERENCE CARR started work at approximately 4:00 AM and finished work at approximately 5:00 PM; which totals approximately to 65 hours per week.

181.    When Plaintiff TERENCE CARR had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $1,124.24; $1,160.12; $1,196.00; $1,231.88; $1,267.76; $1,303.64; $1,345.50.

xxvi.    **TERENCE CARR II**

182.    Plaintiff TERENCE CARR II is an individual over the age of 18 years old and a resident of New Jersey.

183.    TERENCE CARR II has worked full-time as a distributor for Defendants from approximately 1990 until present.

184.    TERENCE CARR II personally services Defendants' accounts.

185.    Over the course of his employment with Defendants, TERENCE CARR II regularly worked full- time for Defendants for over forty (40) hours per week.

186.    From approximately November 1, 2003, to approximately to January 4th, 2021, TERENCE CARR II worked Monday through Friday. TERENCE CARR II started work at approximately 4:00 AM and finished work at approximately 5:00 PM; which totals approximately to 65 hours per week.

187.    When Plaintiff TERENCE CARR II had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018, 2019, 2020, and 2021 he was not paid commission wages in the following respective approximate amounts: $1,124.24; $1,160.12; $1,196.00; $1,231.88; $1,267.76; $1,303.64; $1,345.50.

xxvii.    **MERYL WALDER as the Executor of the Estate of ALAN WALDER**

188.    Plaintiff MERYL WALDER is the Executor of the Estate of ALAN WALDER.

189.    Plaintiff MERYL WALDER as the Executor of the Estate of ALAN WALDER is an individual over the age of 18 years old and a resident of New Jersey.

190.    ALAN WALDER worked full-time as a distributor for Defendants from approximately 2005 until his passing on or about February 25, 2020.

191.    ALAN WALDER personally serviced Defendants' accounts.

192.    Over the course of his employment with Defendants, ALAN WALDER regularly worked full- time for Defendants for over forty (40) hours per week.

193.    From approximately April 11, 2005, to approximately to February 2020, ALAN WALDER worked Monday through Friday. On Monday through Thursday, Mr. Walder started work at approximately 5:30 AM and finished work at approximately 7:00 PM; and on Friday Mr. Walder started work at approximately 5:30 AM and finished work at approximately 5:00 PM, which totals approximately to 65.5 hours per week.

### xxviii.    DONNA MAGNUSSEN AS THE AS THE EXECUTOR OF THE ESTATE OF RICHARD MAGNUSSEN

194.    Plaintiff DONNA MAGNUSSEN is the Executor of the Estate of RICHARD MAGNUSSEN.

195.    Plaintiff DONNA MAGNUSSEN as the Executor of the Estate of RICHARD MAGNUSSEN is an individual over the age of 18 years old and a resident of New Jersey.

196.    RICHARD MAGNUSSEN worked full-time as a distributor for Defendants from approximately before 2015 until his passing on or about March 2018.

197.    ALAN WALDER personally serviced Defendants' accounts.

198.    Over the course of his employment with Defendants, RICHARD MAGNUSSEN regularly worked full- time for Defendants for over forty (40) hours per week.

199.    From approximately 2015 to approximately April 15, 2018, decedent RICHARD MAGNUSSEN worked from approximately 5:00 AM to approximately 4:00 PM Monday through Friday, totaling approximately 55 hours per week.

200.    When decedent RICHARD MAGNUSSEN had to transport broken or spoiled PCBCNY products to customers and then back to PCBCNY in the years 2015, 2016, 2017, 2018 he was not paid commission wages in the following respective approximate amounts: $1,955.20; $2,017.00; $2,080.00; $2,142.40.

B. **DEFENDANT PEPSI-COLA BOTTLING COMPANY OF NEW YORK, INC. (PCBCNY)**

201.    Defendant PCBCNY is a foreign business corporation, duly incorporated and organized under the laws of the State of Pennsylvania, with a principal place of business within the State of New York, at 650 Brush Avenue, Bronx, NY 10465.

202.    Defendant PCBCNY maintains a registered agent for service of process in the State of New York via the CORPORATION SERVICE COMPANY whose address is 80 STATE STREET, ALBANY, NY, 12207 – 2543.

203.    Defendant PCBCNY is an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

204.    At all times herein, Defendant PCBCNY had authority to hire and fire Plaintiffs.

205.    At all times herein, Defendant PCBCNY had authority to supervise Plaintiffs.

206.    At all times herein, Defendant PBCNY had authority to control Plaintiffs' work schedules.

207.    At all times herein, Defendant PBCNY had authority to supervise Plaintiffs' work.

208.    At all times herein, Defendant PBCNY had authority to determine Plaintiffs' rate and method of payment.

209.    At all times herein, Defendant PBCNY had authority to maintain employment records regarding Plaintiffs' work and wages.

210.    Defendant PCBCNY staffs a Transfer Committee ("Transfer Committee").  The Transfer Committee has several functions and empowers its members to hire, promote (or refuse to promote), fire, supervise, control conditions of employment and maintain/access employment records.  The Transfer Committee's several functions include: reviewing and deciding whether to approve the sale of territory from one distributorship to prospective buyer, which can have the effect of hiring or a promotion or increasing income of the distributor whose territory expands.  The

29

Transfer Committee likewise has the power to fire by terminating Distributor Agreement(s).   The Transfer Committee can require notification and approval of the sale or purchase of distributor territory.  The Transfer Committee can schedule when applications to sell or purchase territory (the "transfer application process") must be submitted.   The Transfer Committee can limit the number of applications to sell or purchase territory per cycle.  The Transfer Committee can limit a territory buyer's annual volume of product cases that it sells and distributes to (for example) between 200,000 to 500,000 cases and thereby limit pay.  The Transfer Committee has authority to require that a prospective buyer's territory be contiguous to the territory that is being sold if the prospective buyer is an existing distributor.  The Transfer Committee can evaluate whether the prospective purchaser is suitable and has the necessary business acumen by requiring the prospective buyer to submit a comprehensive business plan that defines the prospective purchaser's "go-to-market" strategy and describe items such as, but not limited to, (a) how the prospective purchaser will pre-sell its territory; (b) the staffing for prospective purchaser's territory; and (c) the delivery vehicles to be used by the prospective purchaser to service the territory.  The Transfer Committee has authority to evaluate the prospective purchaser's financials to ensure that (s)he has adequate financial resources to succeed. The Transfer Committee interviews prospective purchasers of territories before allowing or vetoing a sale and purchase of a distributorship in a process that is akin to hiring.  The Transfer Committee can unilaterally veto the sale or purchase of a distributor's territory without giving any reason.   The Transfer Committee sets the schedule for when applications to sell or purchase territory (the "transfer application process").

211.    The Transfer Committee has supervisory power.  The Transfer Committee can has send agents onto Plaintiffs' territory or route to evaluate it for perceived deficiencies in, for example: handling of merchandise; placement of competitors' products on PCBCNY sales racks and cold

drink equipment; maintenance of new accounts solicited by PCBCNY; and following of marketing planograms and shelving specifications.

## C.  INDIVIDUAL DEFENDANTS

212.    Upon information and belief, each and every one of the individual Defendants possessed and/or possesses and regularly exercised/exercises significant control over Defendant PCBCNY's actual operations and affairs in a manner that relates directly to some or all of the Plaintiffs' employment – including but not limited to Plaintiffs' workplace terms, conditions and operations, personnel decisions, supervision, customer, route, and account oversight, discipline, scheduling, the rate and method of calculating their compensation, method of loading product on the trucks, timing at which to load products to the trucks, as well as deductions and set-offs against compensation.

213.    Each of the individual Defendants is an "employer" within the meaning of federal and state law, and each should therefore be held jointly and severally liable, along with PCBCNY, for the wrongs and substantial damages alleged herein.

214.    Defendants are jointly and severally liable for all damages arising from Defendants' violations of FSLA and NYLL, including their failure to pay overtime wages.

### i.  REGINALD GOINS

215.    Defendant REGINALD GOINS is an employer within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

216.    Under the New York Department of State Division of Corporations entity information, Defendant PCBCNY's Chief Executive Officer is REGINALD GOINS with an address at 650 BRUSH AVE, BRONX, NY, UNITED STATES, 10465.

217.    Defendant REGINALD GOINS is a natural person, the President and Chief Operating Officer ("COO") of Pepsi cola & National Brand Beverage Ltd. with an office and principal place of business in Bronx County, New York.

218.    Defendant REGINALD GOINS has power to hire, promote, and fire Plaintiffs.

219.    Defendant REGINALD GOINS served, and continues to serve, on the PCBCNY Transfer Committee.

220.    Defendant REGINALD GOINS told Plaintiffs and distributors that he has terminated people.  Defendant REGINALD GOINS told Plaintiffs and distributors that he has terminated "several distributors."  Defendant REGINALD GOINS said that if a distributor "causes a problem" then he would participate in removing that distributorship.  Defendant REGINALD GOINS told Plaintiffs that he terminated several distributors because they were doing things that he felt were "unethical."  Defendant REGINALD GOINS told Plaintiffs that he would not allow "unethical behavior" at PCBCNY, insinuating that he would terminate those distributors, including Plaintiffs.

221.    Defendant REGINALD GOINS told Plaintiffs and distributors who were operating under the Former Agreement, that if they did not sign the New Agreement by on or about December 2020, then the Former Agreement would not be renewed, which would effectively terminate those Plaintiffs/distributors.  For example, at a meeting at the New York LaGuardia Airport Marriott, Defendant REGINALD GOINS said he would terminate distributors who would not sign the New Agreement.  Defendant REGINALD GOINS said he would get rid of distributors who did not fit the "new model."

222.    By serving notice of termination of the Former Agreement, Defendant REGINALD GOINS, and Defendant PCBCNY, exercised power to terminate one or more Plaintiffs (including but not limited to Plaintiff, TERENCE POLETTI) who declined to sign the New Agreement.

223.     Upon information and belief, Defendant REGINALD GOINS had/has power to delegate authority to terminate distributors to others.  Upon information and belief, Defendant REGINALD GOINS gave Defendant JOSEPH KLINGLER "full authority" to terminate or remove Plaintiffs.

224.     On or about November 9, 2020, Defendant REGINALD GOINS told Plaintiffs and distributors that if Plaintiffs (and distributors) did not sign the proposed New Agreement, then he "could not imagine" who would purchase the distributorships with limited time remaining on the Former Agreement, because they would be terminated at the end of a five-year (5) period.  In effect, Defendant REGINALD GOINS told Plaintiffs and distributors that refusal to sign the New Agreement rendered the Plaintiff's distributorship subject to any price that Defendant PCBCNY chose to pay for it.

225.     Defendant REGINALD GOINS said that if a distributor, including Plaintiffs, decided not to sign the New Agreement, then the Former Agreement would be terminated and result in termination of the distributorship.  At the end of the term of the Former Agreement, the distributorship would have "no financial conclusion" and there "are no other options."

226.     Upon information and belief, Defendant REGINALD GOINS has power to control and supervise Plaintiffs and distributors.

227.     In many instances, Plaintiffs must stock customers' shelves, fridges, and stores with PCBCNY products according to specifications.  These specifications are variously referred to as "corporate set" or "planograms."  At times, Plaintiffs must build store displays of PCBCNY products according to specifications.  Plaintiffs also had to ensure that PCBCNY coolers and fridges were only used for PCBCNY products.

228.     Upon information and belief, Defendant REGINALD GOINS had the power to delegate supervisory responsibility over the Plaintiffs and distributors to others. Upon information

and belief, Defendant REGINALD GOINS had the power to dispatch inspectors to customers who receive Plaintiffs' deliveries. Inspectors inspect the Plaintiffs'/distributors' work and produce information is used to reprimand Plaintiffs/distributors whose work apparently did not conform to "corporate set" or PCBCNY specifications.

229.    Defendant REGINALD GOINS regularly walks the PCBCNY facilities where Plaintiffs' trucks are loaded daily. On his rounds, Defendant REGINALD GOINS speaks with loaders, observes conditions, speaks with the warehouse manager, and with distributors about their business and operations. For example, as recently as on or about December 2021, Defendant REGINALD GOINS walked the facility at 11202 15TH Ave College Point, NY, 11356-1428.

230.    Upon information and belief, at all relevant times herein, Defendant REGINALD GOINS had authority to determine rate and method of payment of Plaintiffs. Upon information and belief, Defendant REGINALD GOINS could change the price and cost of PCBCNY products, which in turn affected Plaintiffs' commissions. Similarly, upon information and belief, Defendant REGINALD GOINS had power to determine discounts on PCBCNY products which would affect Plaintiffs' commission wages.

231.    Defendant REGINALD GOINS also has power over Plaintiffs' pay through his authority over handheld computers that Plaintiffs must use to sell PCBCNY products. Plaintiffs must use handheld computers ("handhelds") to bill customers for PCBCNY product orders. The handhelds are owned by Defendant PCBCNY. Plaintiffs have no control over the prices that can be charged using the handheld even though Plaintiffs' compensation turns, in part, on the prices charged for PCBCNY products. Plaintiffs have no ability to override the handheld if an incorrect price is set. To fix an incorrect price in the handheld, Plaintiffs require authorization from one or more Defendants or PCBCNY agents.

232.    When Plaintiffs asked for authority to change incorrect prices in handhelds, Defendant REGINALD GOINS refused.  On or about February 12, 2019, Defendant REGINALD GOINS held a meeting at the New York LaGuardia Airport Marriott.  Defendant REGINALD GOINS said that Plaintiffs could not override an incorrect price in the handheld without permission because it would be equivalent of giving Plaintiffs access to "his check book" or the ability to affect "his money."

233.    Upon information and belief, Defendant REGINALD GOINS has access to all records which could form, at least part, of "employer records" as defined in 12 NYCRR 142-2.6. Sch records state, upon information and belief, each Plaintiffs' name, address, wage/commission rate, and other compensation and costs.

234.    Similarly, upon information and belief, Defendant REGINALD GOINS has access to sufficient employer records and information regarding Plaintiffs that he maintains them, and can use them to perform financial analysis.  For example, Defendant REGINALD GOINS is a self-proclaimed "finance guy" (his words).  Defendant REGINALD GOINS studied the revenue and expenses of each distributorship on a "per case basis" (i.e., per case of PCBCNY product). Defendant REGINALD GOINS was also aware of expenses associated with operating a distributorship because Defendant PCBCNY operates its own "in-house" distributorships.  Through his analysis, Defendant REGINALD GOINS was able to determine that Plaintiffs could sell his/her distributorship for approximately $2.00 per case.

235.    Upon information and belief, Defendant REGINALD GOINS, as CEO of PCBCNY, exercises significant operational control over PCBCNY.  Defendant REGINALD GOINS possesses and regularly exercises significant control over PCBCNY's actual operations and affairs, in a manner that relates directly to Plaintiffs' employment.  Defendant REGINALD GOINS told Plaintiffs and distributors that they cannot form partnerships of 50% - 50% shareholding in the

distributorships.  Defendant REGINALD GOINS told Plaintiffs that they are restricted from

transferring 50% or more of the shares of their distributorship companies.  Transfers of shares

require PCBCNY approval.  Defendant REGINALD GOINS told Plaintiffs that they could not sell

portions of their distributorships or form subordinate distributorships like a traditional corporation

might form a sub-corporation.

236.    The totality of the circumstances dictate that Defendant REGINALD GOINS is an

employer under the FLSA and NYLL.

237.    Defendant REGINALD GOINS told HAROLD HONICKMAN and JEFFREY

HONICKMAN to consider offering to purchase distributorships.  Defendant HAROLD

HONICKMAN told Defendant REGINALD GOINS that the distributorships have "no value"

and he would not put a dollar value on the distributorship.  Defendant REGINALD GOINS told

Defendant HAROLD HONICKMAN and JEFFREY HONICKMAN that some distributors, who

had passed away or retired or wished to leave their distributorships could not do so because they

were "essentially trapped." Defendant REGINALD GOINS spent over a year speaking with

Defendant HAROLD HONICKMAN and analyzing information that would ultimately lead

Defendant HAROLD HONICKMAN to change from refusing to purchase distributorships to

allowing the purchase of distributorships for approximately $2.00 per case.

238.    In approximately 2019 and 2020, Defendant REGINALD GOINS spearheaded

efforts by PCBCNY to transition Plaintiffs and distributors from operating under the Former

Agreement to the New Agreement.  Upon information and belief, Defendant REGINALD GOINS

was a principal for PCBCNY in negotiating and setting terms of the New Agreement with principal

members of the New York Pepsi-Cola Distributors Association, Inc (an association of distributors

that includes Plaintiffs).

239.     Defendant REGINALD GOINS had power to decide to negotiate with five or six selected distributors to determine the terms of the New Agreement, rather than individual Plaintiffs/distributors.  Defendant REGINALS GOINS had power to later refuse to "recognize" the New York Pepsi-Cola Distributors Association, Inc and refuse to recognize any other association of distributors.  Defendant REGINALD GOINS likewise had the power to decide he would only negotiate with individual Plaintiffs/distributors regarding contract terms for PCBCNY.

240.     When Defendant REGINALD GOINS negotiated the New Agreement, Defendant REGINALD GOINS introduced a nondisclosure agreement to prevent Plaintiffs from learning of the details of negotiations and possible terms of the New Agreement before they were released to all Plaintiffs and distributors.  Defendant REGINALD GOINS said that if anyone involved in negotiating the New Agreement violated a nondisclosure agreement, REGINALD GOINS would terminate that distributor "immediately."

241.     After drafting the New Agreement, Defendant REGINALD GOINS took a lead role in telling Plaintiffs that if they did not sign the New Agreement, the Former Agreement (and that Plaintiff) would be terminated.  Defendant REGINALD GOINS told Plaintiffs that refusal to sign the New Agreement would spell termination and render their distributorships subject to whatever value PCBCNY would pay.

242.     Defendant REGINALD GOINS said he and JOSEPH KLINGLER had authority to review a "term sheet" containing proposed terms for the New Agreement before its release.  On or about November 2020, Defendant REGINALD GOINS initially offered Plaintiff TERENCE POLETTI an opportunity to view the proposed New Agreement if Plaintiff TERENCE POLETTI signed a non-disclosure agreement.  Even though Plaintiff TERENCE POLETTI agreed to sign the nondisclosure agreement, Defendant REGINALD GOINS unilaterally refused to allow Plaintiff

TERENCE POLETTI to review the proposed New Agreement before it was released to all distributors.

243.     In advance of revealing the New Agreement, Defendant REGINALD GOINS said that he would not have different contracts that apply to Plaintiffs and other distributors in other geographic regions, such as Long Island.

244.     On or about November 2020, Defendant REGINALD GOINS gathered Plaintiffs and distributors to a conference to discuss terms of the proposed New Agreement.  During the November 2020 meeting, Defendant JOSEPH KLINGLER worked with Defendant REGINALD GOINS to review the terms of the proposed New Agreement.  During the November 2020 meeting, Plaintiffs were prohibited from taking notes or making a record of the information.

245.     On or about December 1, 2020, Defendant REGINALD GOINS was required to make a declaration regarding whether Defendant PCBCNY would deliver certain large brands of soft drinks (including Polar and Dr. Brown's).

246.     When the New Agreement was finally released to distributors, they were given approximately three business days to review and sign it before the Former Agreement would be terminated and, effectively, start the clock to terminate those Plaintiffs.

247.     Defendant REGINALD GOINS is one of only two designated recipients of copies of all notices to be provided under the New Agreement.

248.     In addition to spearheading negotiations regarding the New Agreement with Plaintiffs/distributors, Defendant REGINALD GOINS had sufficient managerial authority to negotiate other contracts for PCBCNY.  For example, upon information and belief, Defendant REGINALD GOINS played a principal role in negotiating contracts between Defendant PCBCNY and Teamsters Union Local 812.  Upon information and belief, Defendant REGINALD GOINS

negotiated contracts between Defendant PCBCNY., and loaders on or about November 2021 and the contract was ratified in approximately December 2021.

      ii.   **WILLIAM W. WILSON**

249.    Defendant WILLIAM W. WILSON is an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

250.    Defendant WILLIAM W. WILSON is a natural person and the former President and Chief Executive Officer ("CEO") of PCBCNY, with an office and principal place of business in Bronx County, New York.

251.    Defendant REGINALD GOINS replaced Defendant WILLIAM W. WILSON in the position of CEO of PCBCNY and accordingly, upon information and belief, shared all powers that Defendant REGINALD GOINS possesses.

252.    Upon information and belief, Defendant WILLIAM W. WILSON had authority to hire, promote, and fire distributors. Upon information and belief, Defendant WILLIAM W. WILSON served on the Defendant PCBCNY Transfer Committee. Upon information and belief, Defendant WILLIAM W. WILSON interviewed prospective distributors who wished to purchase distributorships.

253.    Upon information and belief, Defendant WILLIAM W. WILSON had power to control and supervise Plaintiffs. Upon information and belief, Defendant WILLIAM W. WILSON could dispatch inspectors and agents to inspect Plaintiffs' work.

254.    Upon information and belief, Defendant WILLIAM W. WILSON possessed and regularly exercised significant control over PCBCNY's actual operations and affairs, in a manner that related directly to Plaintiffs' employment. Upon information and belief, Defendant WILLIAM W. WILSON had authority to negotiate on behalf of PCBCNY with the New York Pepsi-Cola

Distributors Association, Inc.  Upon information and belief, Defendant WILLIAM W. WILSON exercised operational control over PCBCNY's business.

255.     Defendant WILLIAM W. WILSON demonstrated authority to bind Defendant PCBCNY to negotiated agreements.  For example, on or about July 2016, Defendant WILLIAM W. WILSON sent a letter to a distributor (to wit: "Sunset Beverages, Inc, operated by Philip Granit), proposing certain terms and conditions for the sale of products to Amazon.com and its affiliated businesses.  The subject proposal would have bound Defendant PCBCNY, the New York Pepsi-Cola Distributors Association, Inc, and the subject distributor.  The proposal included a signature line for Defendant WILLIAM W. WILSON to sign on behalf of Defendant PCBCNY.

256.     Upon information and belief, Defendant WILLIAM W. WILSON played a principal role in negotiating a ten-year contract for the sale of Pepsi soft drinks to The City University of New York (i.e., the public university system of New York City).

257.     In approximately 2017, Defendants WILLIAM W. WILSON, JOSEPH HAYES, JOSEPH KLINGLER, and SCOTT ALLMERS held a meeting with principals of the New York Pepsi-Cola Distributors Association, Inc., including Plaintiffs JOSEPH DISTASI, STEVE NIEVES, and VINCENT CARRERI, regarding how to go to market with various PCBCNY products.  At the aforesaid meeting (in the above-enumerated paragraph) Plaintiffs were told that they can have an "opinion" on how to go to market but "do not have a vote," even though Plaintiffs are supposedly "independent" distributors.

### iii.    **JEFFREY HONICKMAN**

258.     Defendant JEFFREY HONICKMAN is an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

259.     Defendant JEFFREY HONICKMAN is a natural person and is the Chief Executive Officer ("CEO") of Pepsi-Cola and National Brand Beverages, Ltd, with an office and principal

place of business in Bronx County, New York.  Pepsi-Cola and National Brand Beverages, Ltd
includes, among its affiliates, PCBCNY

260.    Upon information and belief, Defendant JEFFREY HONICKMAN has the power
to direct the termination of distributors' contracts, which is equivalent to firing.

261.    Upon information and belief, Defendant JEFFREY HONICKMAN has the power
to approve and disapprove the purchase and sale of distributorships, which is consistent with the
power to hire, promote, and fire.

262.    Defendant JEFFREY HONICKMAN also has authority to delegate the authority to
approve and disapprove the purchase and sale of distributorships to others.

263.    Defendant JEFFREY HONICKMAN has significant operational control over
Defendant PCBCNY.  During in prior arbitrations and negotiations with distributors (including
Plaintiffs), before the New Agreement, Defendant JEFFREY HONICKMAN has threatened to
close Defendant PCBCNY.  For example, on or about May 8, 2018, in connection with a contract
arbitration with one or more Plaintiffs/distributors, Defendant JEFFREY HONICKMAN
threatened to close Defendant PCBCNY.

264.    Upon information and belief, Defendant JEFFREY HONICKMAN possesses and
regularly exercises significant control over Defendant PCBCNY's actual operations and affairs, in a
manner that relates directly to Plaintiffs' employment.

265.    Upon information and belief, Defendant JEFFREY HONICKMAN has the power
to delegate significant control over Defendant PCBCNY's actual operations and affairs, in a manner
that relates directly to Plaintiffs' employment. Upon information and belief, Defendant JEFFREY
HONICKMAN has power to delegate the authority to exercise control and supervision over
Plaintiffs by dispatching inspectors to customers which receive Plaintiffs' deliveries. Upon
information and belief, Defendant JEFFREY HONICKMAN delegated decision-making authority

to Defendant JOSEPH KLINGLER regarding the terms and conditions to which one or more Plaintiffs are subject.

266.    Defendant JEFFREY HONICKMAN has power to determine rate and method of payment to Plaintiffs.

267.    Defendant JEFFREY HONICKMAN played a principal role in working with franchisors to participate in eCommerce, i.e., when Amazon and other franchisors deliver to customers on Plaintiffs' routes, which affects pay received by Plaintiffs.  Plaintiffs are compensated for e-commerce deliveries which fall on their distributorship territories with checks signed by Defendant JEFFREY HONICKMAN.  In approximately 2017, Defendant JEFFREY HONICKMAN said, "we are spending a lot of time right now with our franchisors to figure out how to participate in eCommerce in a way that works both for the franchisor and the franchisee," and "We're actively testing with Pepsi-Cola, DPSG and with Evian. We're testing and learning with our franchisor partners to figure out what works best, but we truly believe it is a channel that is going to play a big role."  In approximately 2017, Defendant JEFFREY HONICKMAN also said, eCommerce is "not a significant piece of our business today, but we look at eCommerce across all categories, and we see how significant it is, and we look at it at other parts of the world and see how significant it is," and he continues, "we're heading in that direction, so it's something we need to design for with our partners."  Upon information and belief, Defendant JEFFREY HONICKMAN signs and issues checks to distributors in connection with eCommerce.

268.    Like eCommerce, when Pepsi products were sold to retailers (customers) in Plaintiffs'/distributors' territories, Defendant JEFFREY HONICKMAN issued quarterly checks to Plaintiffs/distributors to compensate them for products sold in their territories from out-of-state ("trans shipping").

269.     Defendant JEFFREY HONICKMAN's issued a check dated October 20, 2021, to "KJL Distributor" from Defendant PCBCNY.  Defendant JEFFREY HONICKMAN issued one or more checks to "V.D.C. Distributors, Inc." dated January 3, 2022.

270.     Defendant JEFFREY HONICKMAN also paid for PCBCNY to buy a distributorship.  Defendant JEFFREY HONICKMAN executed a check for approximately $240,000 to "LTL Distributors, Inc.," which was owned by decedent ALAN WALDER.  Upon information and belief, Plaintiff MERYL WALDER received a duplicate check from Defendant PCBCNY for approximately $247,000 and Defendant JEFFREY HONICKMAN called her saying she could not keep the funds.  Defendant JEFFREY HONICKMAN refused to otherwise negotiate for sale of the distributorships or allow Plaintiff MERYL WALDER to continue to operate the distributorship after ALAN WALDER deceased.  Plaintiff MERYL WALDER as the Executor of the Estate of ALAN WALDER received the check, issued by Defendant JEFFREY HONICKMAN.

271.     Upon information and belief, Defendant JEFFREY HONICKMAN has operational control over Defendant PCBCNY.

272.     Upon information and belief, Defendant JEFFREY HONICKMAN played a principal role in negotiating terms related to the Former Agreement, which affect the conditions of Plaintiffs'/distributors' conditions of employment.  For example, upon information and belief, Defendant JEFFREY HONICKMAN took steps to introduce an evergreen provision in the Former Agreement(s) between Defendant PCBCNY and Plaintiffs/distributors.  Under the evergreen provision, Defendant PCBCNY could decline to renew the Former Agreement and cause termination in five (5) years.

273.     Upon information and belief, Defendant JEFFREY HONICKMAN told Plaintiff MERYL WALDER that his lawyers had spent over a year and millions of dollars (or another

significant sum of money) on the New Agreement. Upon information and belief, Defendant JEFFREY HONICKMAN authorized Defendant PCBCNY to purchase distributorships under the New Agreement for approximately $2 per case. MERYL WALDER was prohibited from continuing to operate the distributorship or operate the route. Defendant JEFFREY HONICKMAN is one of two designated recipients of copies of all notices to be provided under the New Agreement.

274. Similarly, upon information and belief, Defendant JEFFREY HONICKMAN played a principal role in negotiating contracts between Defendant PCBCNY and Teamsters Union Local 812. For example, on or about October and/or November 2021, Defendant JEFFREY HONICKMAN played a principal role in contracting between Defendant PCBCNY and Teamsters Union Local 812 and truck drivers who distribute beverages directly for Defendant PCBCNY. The foregoing negotiations covered other trades as well, including but not limited to porters, loaders, and production workers.

275. Upon information and belief, Defendant JEFFREY HONICKMAN remains informed of the daily operations of Defendant PCBCNY. For example, on or about May 30, 2013, Defendant JEFFREY HONICKMAN was a recipient of an email confirming that Defendant PCBCNY. obtained a ten-year (10) contract to provide services for The City University of New York (CUNY). On or about June 28, 2013, Defendant JEFFREY HONICKMAN was a recipient of an email listing changes to the sales organization of Defendant PCBCNY that included promotions of managers.

276. Defendant JEFFREY HONICKMAN's decisions regarding which products to promote in which geographic regions affect Plaintiffs' conditions of employment because Plaintiffs are required to promote, as well as deliver, those beverages to customers. The promotion and sale of beverages affects Plaintiffs' commissions. For instance, Defendant JEFFREY HONICKMAN is

a member of the American Beverage Association and served as a chair of its board.  In

approximately 2017, Defendant JEFFREY HONICKMAN said, Bedford-Stuyvesant, an area in

Brooklyn, N.Y. is "one of the areas where people are more obese than the general population, [and]

we've been working the program and evaluating [it] over the course [of] the last year, and we think

we've made a pretty good impact."  He also said, "we are promoting more heavily our smaller

packages, lower-calorie offerings and we're starting to see a shift, but it's a slow shift to be perfectly

honest. … You can't change consumer behavior overnight, but we're seeing that it's starting to make

a difference."  Plaintiffs have been called upon to promote unpopular products in their territories

based on policies set by (upon information and belief) Defendant JEFFREY HONICKMAN, which

in turn, affects Plaintiffs' commission wages.  Upon information and belief, the products which

Plaintiffs must promote, and sell are influenced, in a significant part, by policy decisions set, in a

significant part, by Defendant JEFFREY HONICKMAN.

      277.      Upon information and belief, competition from other bottling networks such as The

Coca-Cola Co., influenced the formation of the New Agreement, which affects Plaintiffs' conditions

of employment and changed loading procedures to match those in other Honickman Group bottling

plants.  In approximately 2017, Defendant JEFFREY HONICKMAN said, "in order to compete

more effectively with what Coke is putting together, we think the scale in both our Pepsi-Cola and

Canada Dry businesses needs to change because we are now competing with a consolidated Coke

bottler that covers an area stretching from New York to Philadelphia."  Defendant JEFFREY

HONICKMAN also said, "it's one territory for them, and it is disjointed for us."  Defendant

JEFFREY HONICKMAN said, "on the Pepsi side of the business, we are the Pepsi-Cola bottler in

New York City, but the parent company owns the New Jersey and Philadelphia territories, so we

need to coordinate with one another in order to effectively compete with Coca-Cola, which is now a

single business unit." Defendant HAROLD HONICKMAN has said, consolidated operations are the best way to recapture sales.

278. Defendant JEFFREY HONICKMAN is keenly aware of the costs Plaintiffs must bear, which are costs PCBCNY avoids, by classifying Plaintiffs as "independent contractors." Defendant JEFFREY HONICKMAN is aware that New York City imposes higher costs for fuel, labor, living and greater complexity (e.g. from traffic congestion than other markets in the United States. In approximately 2017, Defendant JEFFREY HONICKMAN said, regarding the New York City market, "I can't think of another market in the country where you end up with $1 million a year in parking tickets." He is keenly aware of the operational challenges of the New York City market that Plaintiffs must face and bear, having said, "we find consumers in the cities tend to shop almost daily, whereas in the suburbs it's a little more traditional" and "the packages that we promote and how we promote them is a little bit different in the cities."

### iv. **JOSEPH KLINGLER**

279. Defendant JOSEPH KLINGLER is also an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

280. Defendant JOSEPH KLINGLER is a natural person and a Senior Vice President of PCBCNY, with an office and principal place of business in Bronx County, New York.

281. Upon information and belief, Defendant JOSEPH KLINGLER has power to hire, promote, and fire distributors.

282. Defendant JOSEPH KLINGLER serves, and, at all relevant times, served on the PCBCNY Transfer Committee.

283. Defendant JOSEPH KLINGLER was a principal actor in terminating Rebecca Beverages Inc. distributorship, which was owned by Plaintiffs TERENCE CARR and TERENCE CARR II. Upon information and belief, on or about January 2021, Defendant JOSEPH

46

KLINKLER participated in terminating Plaintiff TERENCE CARR for allegedly working with a helper who had a second, and unrelated, job which involved delivering non-PCBCNY products.

284. As part of the hiring and promotion process (whereby territory is purchased by one distributor from another), Defendant JOSEPH KLINGLER interviewed prospective buyers who wished to purchase distributorships, which is, in effect, a hiring process. On or about June 8, 2021, Defendant JOSEPH KLINGLER denied a "transfer of territory from Hoyt Distributors, Inc. and KNS Sales, Inc." which were owned by Plaintiff DONNA MAGNUSSEN. Similarly, Defendant JOSEPH KLINGLER refused to approve the sale of the distributorship from decedent RICHARD MAGNUSSEN to his surviving wife, Plaintiff DONNA MAGNUSSEN. Defendant JOSEPH KLINGLER coordinated the purchase of one or more distributorships to Defendant PCBCNY. Defendant JOSEPH KLINGLER coordinated the purchase of a distributorship referred to as Next Level Beverage Distributors Inc, owned by Plaintiff KIRK RODRIGUEZ, for Defendant PCBCNY.

285. Defendant JOSEPH KLINGLER has authority to coordinate the transfer of one or more Plaintiff's territories to other distributors and assets belonging to the distributorship(s) (e.g., the truck) for set prices. Upon information and belief, on or about December 23, 2020, Defendant JOSEPH KLINGLER confirmed the transfer of territorial rights for distributorship Next Level Beverage Distributors Inc to Defendant PCBCNY, and its truck, for approximately $2.10 per case and confirmed that there would be no execution of the New Agreement.

286. Defendant JOSEPH KLINGLER had power to control and supervise Plaintiffs. Defendant JOSEPH KLINGLER had authority to supervise Plaintiffs and control their conditions of employment.

287. On or about June 8, 2021, Defendant JOSEPH KLINGLER wrote a letter to Matthew Pena, who assists in operating the distributorship for Plaintiff DONNA MAGNUSSEN,

in which Defendant JOSEPH KLINGLER is identified as the "SVP & Chief of Staff." In the letter, Defendant JOSEPH KLINGLER denies a "transfer of territory from Hoyt Distributors, Inc., and KNS Sales, Inc" because multiple market tours were performed in the territory and "found various deficiencies and an overall lack of oversight." Defendant JOSEPH KLINGLER further stated that these alleged deficiencies were raised to Matthew Pena. Defendant JOSEPH KLINGER continues to state that Mr. Pena "failed to correct the executional shortfalls." Defendant JOSEPH KLINGLER lists examples of alleged deficiencies, which included:

> A. Competitors' products were found on numerous Company sales racks and cold drink equipment;

> B. New accounts recently solicited by the Company have not been maintained;

> C. Marketing planograms have not been followed;

> D. Poor merchandising, out of stocks, and non-rotated product were found in various outlets;

> E. Food products were found in a Company cooler at an outlet; and

> F. Innovation, points of inspiration and point of sale execution were poor in the accounts visited."

288. In another supervisory act, upon information and belief, in approximately 2016, Defendant, JOSEPH KLINGLER, through a supervisor, confronted Plaintiff STEVEN NIEVES and claimed that he (STEVEN NIEVES) could not make deliveries when not in uniform.

289. On or about 2019, Defendant JOSEPH KLINGLER held meetings with Plaintiffs regarding how to improve their distribution of PCBCNY products.

290. Defendant JOSEPH KLINGLER also supervises Plaintiffs at PCBCNY facilities. Defendant JOSEPH KLINGLER has a designated parking space at 650 Brush Avenue, Bronx, New York 10465, out of which several Plaintiffs operate. Defendant JOSEPH KLINGLER directed

Plaintiffs to present a security badge to enter Defendant PCBCNY property. Defendant JOSEPH KLINGLER directed Plaintiffs that truck keys must be signed in and out. Defendant JOSEPH KLINGLER required Plaintiffs to comply with one or more Defendants' COVID19 mask policy. Defendant JOSEPH KLINGLER required Plaintiffs provide copies of COVID-19 vaccination cards to enter one or more of Defendants' facilities by specific deadlines. Defendant JOSEPH KLINGLER fields questions regarding the COVID-19 policies. Defendant JOSEPH KLINGLER is alerted of theft of Plaintiffs' property, such as theft of trucks and Pepsi-Cola merchandise, at or near Defendant PCBCNY's premises.

291. Upon information and belief, Defendant JOSEPH KLINGLER was authorized to respond to proposed changes to distributorship agreements. On or about November 5, 2021, Defendant JOSEPH KLINGLER wrote to Plaintiff LEONARD COSTA that Defendant PCBCNY would not modify an agreement between Plaintiff LEONARD COSTA and Defendant PCBCNY. In approximately December 2020, Defendant JOSEPH KLINGLER called Plaintiff STEVEN WEIDLER to determine if he was unhappy about the New Agreement. Defendant JOSEPH KLINGLER told Plaintiff STEVEN WEIDLER that the New Agreement provided an assurance of the value of the distributorship. Upon information and belief, Defendant JOSEPH KLINGLER took calls regarding the New Agreement and held meetings with distributors regarding the New Agreement. On or about December 22, 2020, Defendant JOSEPH KLINGLER told Plaintiffs, that the deadline to sign the New Agreement would expire on December 23, 2020 and would not be extended.

292. Defendant JOSEPH KLINGLER called distributors, which would include individuals who are members of the prospective Collective or Class in this litigation, to a meeting at the New York LaGuardia Airport Marriot, regarding this litigation, "Poletti et al v. Pepsi-Cola Bottling Company Of New York, Inc. et al," bearing case number 1:21-cv-07603-VSB.

v. **SCOTT ALLMERS**

293.      Defendant SCOTT ALLMERS is an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

294.      Defendant SCOTT ALLMERS is a natural person and a Vice President of PCBCNY, with an office and principal place of business in Bronx County, New York.

295.      Defendant SCOTT ALLMERS has power to hire, promote, and fire Plaintiffs.

296.      Defendant SCOTT ALLMERS serves, and, at all relevant times, served on the PCBCNY Transfer Committee.

297.      Defendant SCOTT ALLMERS, REGINALD GOINS, and JOSEPH KLINGLER are cc-ed on letters terminating distributors.  Upon information and belief, Defendant SCOTT ALLMERS was involved in terminating with Plaintiffs TERENCE CARR and TERENCE CARR II.

298.      Upon information and belief, Defendant SCOTT ALLMERS supervised Plaintiffs and controlled their conditions of employment.  Defendants JOSEPH HAYES and SCOTT ALLMERS have directed Plaintiffs and distributors in how to stock store shelves and displays according to Defendant PCBCNY's specifications or corporate set.

299.      In supervising Plaintiffs, Defendant SCOTT ALLMERS had power to reprimand Plaintiffs for alleged wrongdoing.  Defendant SCOTT ALLMERS was empowered to reprimand and threaten termination to Plaintiffs for negative encounters with customers which receive deliveries from Plaintiffs.  On or about July 20, 2021, Defendant SCOTT ALLMERS required Plaintiff LEONARD COSTA to meet with him regarding an alleged complaint from a Duane Reade store.  Defendant SCOTT ALLMERS refused to allow Plaintiff LEONARD COSTA to bring representation with him to the meeting.  Plaintiff LEONARD COSTA was further advised that if he brought representation, such as a lawyer, he would receive a "letter," which could reasonably be

interpreted as being a termination letter. Defendant SCOTT ALLMERS reprimanded Plaintiff

LEONARD COSTA for having allegedly used "unprofessional and abusive language."

On or about July 26, 2021, Defendant SCOTT ALLMERS sent a written reprimand to Plaintiff

LEONARD COSTA alleging that he "used unprofessional and abusive language" towards Duane

Reade Store personnel.

     300.    Upon information and belief, Defendant SCOTT ALLMERS had control over the

loading process and staffing to load Plaintiffs' trucks.  On or about June 28, 2016, Defendant

SCOTT ALLMERS coordinated truck loading for Defendant PCBCNY.

     301.    Loaders work 24-hours per day loading trucks with PCBCNY products.  Plaintiffs

must be present on Defendant PCBCNY premises to submit a loading diagram, which would

specify where to load which products and pallets on Plaintiffs' truck and in which bay

(compartment) so they could be accessed later upon delivery.  Under one long-standing loading

method, Plaintiffs/distributors were required to submit a loading diagram for Defendants to load

trucks for the next day's deliveries.  Loaders load Plaintiffs' trucks according to the diagram.  In or

about 2019, Defendants SCOTT ALLMERS and JOSEPH KLINGLER required Plaintiff

LEONARD COSTA to submit his loading diagram by 10:00 PM; then required that it be submitted

by 8:00 PM; then required that it be submitted by 4:00 PM; or threatened to refuse to load his

(Plaintiff LONEARD COSTA's) truck.  As a result of the deadline to submit loading diagrams,

Defendants SCOTT ALLMERS and JOSEPH KLINGLER control Plaintiff LEONARD COSTA's

work hours and ability to distribute PCBCNY products.  Even though one or more Defendants'

loaders work 24-hours per day loading trucks, the requirement to submit loading diagrams at

designated times affects the work schedule of Plaintiff LONEARD COSTA.

302. On or about 2017, Defendants JOSEPH HAYES, SCOTT ALLMERS and JOSEPH KLINGLER instructed one or more Plaintiffs (including but not limited to STEVEN NIEVES) to arrive to one or more Defendants' premises with loads at specific times.

303. In or about 2018, Defendant PCBCNY, through Defendant JOSEPH HAYES, ran a promotion for three-liter bottles of soft drinks. To participate in the promotion, one or more Plaintiffs/distributors were required to work on Saturdays.

304. On or about January 2021, Defendant SCOTT ALLMERS helped to introduce Defendant PCBCNY's new loading procedures at 650 Brush Avenue, Bronx, New York 10465. The new loading procedure revoked Plaintiffs' ability to control how to load their own trucks, which affects the time it takes Plaintiffs to complete distribution of Defendant PCBCNY's products and affects Plaintiffs' workload. Under the former loading system, Plaintiffs controlled how their trucks would be loaded by designating the bays where products were placed for efficient access on the next day's deliveries. Under the new loading procedure, Defendants unilaterally control how Plaintiffs' trucks are loaded, with the effect of increasing their workload or reducing the amount of product that could be hauled. For example, the new loading procedure may put products at the bottom of the pile of other products or separate it into multiple bays (truck compartments), making it time consuming and difficult to access. The effect of loading fewer products on the truck using the new loading procedure is to require more trips to Defendant PCBCNY's facility to re-load and reduce commissions earned. The new loading procedure increased the centralized control of Defendants over Plaintiffs.

305. Upon information and belief, Defendant SCOTT ALLMERS had authority to affect Plaintiffs' commissions. For example, Defendant SCOTT ALLMERS previously urged a distributor to reduce his commission by twenty-five (25) cents to attract an account from JetBlue Airways.

306.     On or about June 2019, Plaintiffs' unrestricted access to the "Margin Minder" computer system was revoked.  Before revoking access to "Margin Minder," Defendant SCOTT ALLMERS coordinated access to "Margin Minder" on behalf of Defendant PCBCNY.

307.     Upon information and belief, Defendant SCOTT ALLMERS possesses and regularly exercises significant control over PCBCNY's actual operations and affairs, in a manner that relates directly to Plaintiffs' employment.

308.     Defendant SCOTT ALLMERS hosted sales meetings for Plaintiffs and distributors. Defendant SCOTT ALLMERS discussed new PCBCNY products, business opportunities and how Plaintiffs should improve their operation to sell and distribute more PCBCNY products.  Defendant SCOTT ALLMERS identified statistics between PCBCNY facilities to compare the profitability of each facility's distributing operations.

309.     Upon information and belief, in approximately 2017, a customer opened a warehouse on a route which ostensibly should have been serviced exclusively by Plaintiff ROBERT ELISEO.  Since the warehouse fell on a route that was to be serviced by Plaintiff ROBERT ELISEO, Plaintiff ROBERT ELISEO should have had the opportunity to sell and distribute to that warehouse.  Despite the supposed exclusivity, Defendant SCOTT ALLMERS gave permission to another distributor to service the warehouse. When Plaintiff ROBERT ELISEO learned of the arrangement, Defendant SCOTT ALLMERS was called in to resolve the dispute.

310.     Defendant SCOTT ALLMERS authorized donations of PCBCNY's products on behalf of Defendant PCBCNY.  In approximately 2016, through coordination by Defendant SCOTT ALLMERS, Defendant PCBCNY, entered Plaintiffs'/distributors' routes (including Plaintiffs STEVEN NIEVES and TERENCE CARR II) to distribute free samples of products to actual and/or potential customers (i.e., retail stores).  The result of the free sample distribution was lost business to one or more Plaintiffs/distributors who could not sell to customers who obtained

free samples.  On or about June and/or July 2018, Defendant SCOTT ALLMERS directed a product donation on behalf of Defendant PCBCNY.  Distributing free samples on Plaintiffs' routes affects the commissions that Plaintiffs could earn by depriving them of potential customers.

vi.     **JOSEPH HAYES**

311.    Defendant JOSEPH HAYES is also an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

312.    Defendant JOSEPH HAYES is a natural person and a Vice President of Sales for PCBCNY, with an office and principal place of business in Bronx County, New York.

313.    Defendant JOSEPH HAYES has power to hire, promote, and fire Plaintiffs.

314.    Defendant JOSEPH HAYES serves, and, at all relevant times, served on the PCBCNY Transfer Committee.

315.    On or about approximately April 2016, Defendant JOSEPH HAYES prevented Plaintiff LEONARD COSTA from selling a route to a distributor "BridgeView Beverage."  Instead, Plaintiff LEONARD COSTA was forced to sell the route to Rebecca Beverage for less money than the other buyer.  On or about May 23, 2018, Defendant JOSEPH HAYES held a meeting to authorize the sale of Madera Distributor Inc.  Defendant JOSEPH HAYES was present at the closing for Plaintiff STEVEN WEIDLER's purchase of the Bay View distributorship in approximately January 2020.

316.    Defendant JOSEPH HAYES supervised Plaintiffs.  Defendant JOSEPH HAYES went to customers' retail businesses and photographed store shelves to determine whether Plaintiffs stocked shelves according to the "corporate set" diagram.  Defendant JOSEPH HAYES visited territories owned by Plaintiff STEVEN WEIDLER and approved of his work at customers' businesses.  On or about autumn of 2019, Defendant SCOTT ALLMERS called and reprimanded Plaintiff LEONARD COSTA about the conditions of a CVS store which Defendant SCOTT

HAYES believed was serviced by Plaintiff LEONARD COSTA.  Defendant SCOTT ALLMERS reprimanded Plaintiff LEONARD COSTA that the store stocks were running low or empty.  Defendant SCOTT ALLMERS reprimanded Plaintiff LEONARD COSTA that the cooler was not properly organized.  Defendant JOSEPH HAYES has told Plaintiff LEONARD COSTA to resolve ongoing problems with drug stores including six (6) Duane Reade's, two (2) CVS stores, and one (1) Rite Aid.  Defendant JOSEPH HAYES told Plaintiff LEONARD COSTA to resolve problems with one or more drug stores or could take steps to terminate Plaintiff LEONARD COSTA.

317.    To supervise Plaintiffs, Defendant JOSEPH HAYES performed "business reviews" of Plaintiffs' work.  The "business review" is a report on the Plaintiffs' sales and delivery performance.  On or about August 19, 2015, Defendant JOSEPH HAYES conducted a "business review" of Plaintiff JOSEPH DISTASI's distributorship.  During the business review, Defendant JOSEPH HAYES analyzed sales of Mountain Dew, sales volumes, and customer knowledge.  During the business review, Defendant JOSEPH HAYES said that he would join Plaintiff JOSEPH DISTASI "in the market" when Plaintiff JOSEPH DISTASI is "pre-selling."  Under the New Agreement, Defendants PCBCNY, REGINALD GOINS, JOSEPH KLINGLER and SCOTT ALLMERS have power to determine whether certain customers are designated as "merchandise" or "nonmerchandise."  The designation affects Plaintiffs' commissions.

318.    Upon information and belief, Defendant JOSEPH HAYES possesses and regularly exercises significant control over PCBCNY's actual operations and affairs, in a manner that relates directly to Plaintiffs' employment.

   **vii.    HAROLD HONICKMAN**

319.    Defendant HAROLD HONICKMAN is an "employer" within the meaning of the FLSA (29 U.S.C. § 203), and NYLL § 190(3).

320.    Upon information and belief, Defendant HAROLD HONICKMAN is a leader in the independent bottler community and founder of the Honickman Group, of which PCBCNY is a part.  Defendant HAROLD HONICKMAN is the founder and chairman of Pepsi-Cola & National Brand Beverages Ltd., of which PCBCNY is a part.

321.    Defendant PCBCNY is part of The Honickman Companies, a family-owned-and-operated business since 1957.  The Honickman Companies' website displays a truck painted "Pepsi" on its front page.  The Honickman Companies remain "committed to the family-owned-and-operated model that has shaped The Honickman Companies over more than half a century."

322.    Upon information and belief, Defendant HAROLD HONICKMAN has the power to hire, promote, and fire Plaintiffs.

323.    Upon information and belief, Defendant HAROLD HONICKMAN authorized Defendant REGINALD GOINS to agree to certain terms in the New Agreement.

324.    Upon information and belief, Defendant HAROLD HONICKMAN delegated to Defendant REGINALD GOINS power over Plaintiffs' conditions of employment and negotiation of the New Agreement.

325.    Upon information and belief, Defendant HAROLD HONICKMAN possesses and regularly exercises significant control over PCBCNY's actual operations and affairs, in a manner that relates directly to Plaintiffs' employment.  Upon information and belief, Defendant HAROLD HONICKMAN has the power to delegate significant control over PCBCNY's actual operations and affairs, in a manner that relates directly to Plaintiffs' employment.  Upon information and belief, Defendant HAROLD HONICKMAN has power to delegate the authority to exercise control and supervision over Plaintiffs by dispatching inspectors to customers which receive Plaintiffs' deliveries.

326.    Upon information and belief, Defendant HAROLD HONICKMAN routinely went to work to give advice to executives and regularly visited the bottling floor.  Defendant JEFFREY

HONICKMAN referred to this practice as "management by walking around." Upon information and belief, approximately every one or two months, Defendant HAROLD HONICKMAN visited the PCBCNY facility at 650 Brush Avenue, Bronx, New York 10465. On or about December 2021, Defendant HAROLD HONICKMAN walked the facility at 11202 15TH Ave College Point, NY, 11356-1428.

327. Upon information and belief, Defendant HAROLD HONICKMAN has power over Plaintiffs' compensation. Upon information and belief, Defendant HAROLD HONICKMAN authorized Defendant REGINALD GOINS and Defendant PCBCNY to purchase distributorships under the New Agreement for approximately $2.00 per case. At a May 2019 meeting on PCBCNY premises, Defendant HAROLD HONICKMAN discussed that he might purchase distributorships for $3 per case and then re-sell them to Plaintiffs at $1 per case, which did not occur. At a May 2019 meeting on PCBCNY premises, Defendant HAROLD HONICKMAN discussed that he may pay for the Plaintiffs' pension liabilities, which would become due if the distributor tried to sell his/her distributorship before retirement.

328. Defendant HAROLD HONICKMAN attended a meeting, held at Defendant PCBCNY's facility, 650 Brush Avenue, Bronx, New York 10465. During the meeting, one or more Defendants, including Defendant HAROLD HONICKMAN, discussed how to provide service to vending machines which were on territories/routes that were ostensibly "sold" to one or more Plaintiffs/distributors, but the vending machines were serviced by third-party vending machine companies with warehouses outside of Plaintiffs'/distributors' routes. Defendant JEFFREY HONICKMAN also attended the aforesaid meeting. Defendant REGINALD GOINS also attended the aforesaid meeting. Plaintiffs/distributors sought to provide service to the vending machines on their routes. Plaintiffs operated a distributorship ("Turn Around Management") to transport PCBCNY products to one or more warehouses/companies which in turn supplied

PCBCNY products to vending machines on Plaintiffs' routes. The income from the "Turn Around Management" distributorship was then shared among Plaintiffs and distributors.

329. On or about June 1, 2021, the vending machine stops were revoked. Defendant JEFFREY HONICKMAN agreed to have the vending machine stops paid for. Plaintiffs and distributorships were not paid for the revocation of the vending machine stops or the destruction of Turn Around Management.

330. On or about June 29, 2021, Plaintiff TERENCE POLETTI met with Defendants HAROLD HONICKMAN, JEFFREY HONICKMAN and REGINALD GOINS at 650 Brush Avenue, Bronx, New York. At that time, Plaintiff TERENCE POLETTI sought to negotiate a New Agreement. Defendant REGINALD GOINS had said that he wanted all distributors, including Plaintiffs, to operate under one uniform contract from Long Island through the City of New York. Defendants declined to negotiate a New Agreement with Plaintiff TERENCE POLETTI. Defendants JEFFREY HONICKMAN and HAROLD HONICKMAN discussed new loading technology that would be added through their investment. Defendants JEFFREY HONICKMAN and HAROLD HONICKMAN offered to show Plaintiff TERENCE POLETTI their loading operation in Pennsauken Township, New Jersey.

331. Defendants refused to continue working with Turn Around Management. Defendants' termination of "Turn Around Management" cost Plaintiffs and distributors approximately $250,000 per year.

332. Upon information and belief, Defendant HAROLD HONICKMAN remained informed as to operational conditions of Defendant PCBCNY.

333. Upon information and belief, Defendant HAROLD HONICKMAN was copied on internal emails regarding Defendant PCBCNY business. On or about May 30, 2013, Defendant HAROLD HONICKMAN was a recipient of an email confirming that Defendant PCBCNY

obtained a ten-year (10) contract to provide services for The City University of New York (CUNY). On or about June 28, 2013, Defendant HAROLD HONICKMAN was a recipient of an email listing changes to the sales organization of PCBCNY that included promotions of managers.

334. In approximately October 2015, Defendant HAROLD HONICKMAN told a reporter, "we're losing, I would say, 1.5 to 2 percent of our business every year." On approximately 2018, Defendant HAROLD HONICKMAN showed Plaintiffs their work areas at the opening of a new PCBCNY facility at Avenue D. On or about January 2019, Defendants HAROLD HONICKMAN, JEFFREY HONICKMAN, REGINALD GOINS attended an "ALT" meeting held by PepsiCo, Inc. (i.e., "parent Pepsi") regarding the year's strategy and products. On or about May 2019, Defendant HAROLD HONICKMAN met Plaintiffs and distributors at a PCBCNY facility and explained the new loading system.

335. On or about December 2 and 3, 2019, Defendants HAROLD HONICKMAN, JEFFREY HONICKMAN, and REGINALD GOINS showed Plaintiffs STEVEN MARTIN and GEORGE MURN the new loading methods used at the Pepsi-Cola Company facilities at 8275 N Crescent Blvd, Pennsauken Township, NJ 08110. The new loading methods would require all Plaintiffs/distributors to pre-sell products (using the PCBCNY system) that they intended to distribute the following day(s) rather than load their trucks and sell at the time of delivery.

336. In approximately autumn, 2019, Defendants HAROLD HONICKMAN and SCOTT ALLMERS conferenced with Plaintiff GEORGE MURN and stated that new products would become available for Plaintiffs to sell

337. Upon information and belief, Defendant HAROLD HONICKMAN had authority in negotiating contracts with Teamsters Union Local 812. On or about October and/or November 2021, Defendant HAROLD HONICKMAN joined in contract negotiations between Defendant PCBCNY, Teamsters Union Local 812 and drivers who distribute Pepsi products directly for

59

Defendant PCBCNY, porters, loaders, and production workers. The foregoing negotiations covered other trades, including but not limited to porters, loaders, and production workers. Defendant REGINALD GOINS joined in the aforesaid union negotiations. Defendant HAROLD HONICKMAN met with president of Teamsters Union Local 812, Joe Vitta. Upon information and belief, Defendant HAROLD HONICKMAN's approval was required in the aforesaid negotiations.

## IV.     FACTS SUPPORTING RELIEF

338.    Defendant PCBCNY and the individual Defendants misclassified Plaintiffs as "independent contractors," rather than "employees."

339.    Defendants knowingly and intentionally deprived Plaintiffs of all the benefits, privileges, and protections available to other PCBCNY employees. In so doing, Defendants wrongfully disregarded and carefully avoided meeting their statutory and common law duties, as "employers," to Plaintiffs, as "employees," including statutory wage and hour provisions, record-keeping requirements, employment taxes, workers compensation insurance, etc.

340.    All the while, PCBCNY and the individually named Defendants exercise a high degree of control and oversight of Plaintiffs' activities, such that the use of the term "independent contractors" is meaningless. In fact, the reality is just the opposite. Defendants oversee and dictate virtually every aspect of the Plaintiffs' working lives. Simply put, Defendants are Plaintiffs' employers.

341.    Plaintiffs are required to form entities such as corporations or limited liability companies or other legal entities to compensate a driver with a state-issued driver's license, to transport goods in the State of New York and operate a commercial motor vehicle.

342.    Each Plaintiff must sign a Distributor Agreement as a mandatory condition of employment. The date, time, and place of execution of each Plaintiff's Agreement is within the

knowledge of Defendant PCBCNY as each Agreement is maintained in the regular course of business. The Agreement is the same in all material respects.

343.     Although each Distributor Agreement contains various statements and language purporting to classify Plaintiffs as "independent agents," this classification fails to account for the economic realities of the relationship.

344.     Plaintiffs and the class they represent were hired by Defendants to work as "independent contractors" pursuant to the terms of the Distributor Agreements.  In fact, Defendants knew or should have known, always, that the "independent contractor" classification in the Agreements was and is improper and that, in fact, Plaintiffs and all similarly situated persons, were and are "employees" entitled to the benefits and protections of all laws enacted for employees. Plaintiffs are informed, believe and on that basis allege, that Defendants intentionally misled Plaintiffs and the class they represent as to their employment status, or made such representations to Plaintiffs and class members recklessly and/or negligently, for the purpose of realizing unjust profits from Plaintiffs' work and/or to avoid paying for its operating costs and payroll taxes to increase competitiveness.

345.     Upon information and belief, Defendants retain the right (pursuant to the Distributor Agreement) to, inter alia, approve or disapprove the vehicle used to provide service, the right to approve or disapprove the purchase or sale of any vehicle, the right to assign delivery stops to each driver, the right to temporarily transfer portions of any route to another with or without compensation, the right to determine when a distributor has "too few" or "too many" case sales, the right to inspect vehicles and drivers for compliance with appearance standards, the right to terminate the contract upon notice whenever Defendants determine any provision of the Agreement was "violated," amounting to the right to terminate at will, the right to require the use of communication equipment and wearing of PCBCNY uniforms, the right to take vehicles out of service, the right to

review and evaluate "customer service" and set standards of such service, the right to require Plaintiffs to perform service at "times" requested by customers and determined by one or more Defendants, the right to withhold pay for certain specified expenses, the right to require purchase of specified insurance, and numerous other purchases by distributors, the right to require completion of specified paperwork, and other rights reserved to Defendants.

346. The New Agreement is a contract of adhesion, drafted exclusively by Defendants and/or its legal counsel, with no negotiation with individual Plaintiffs who are required to sign the New Agreement as a condition of employment or be terminated. Defendants required Plaintiffs to sign the New Agreement "as is," without any changes made to the terms contained therein.

347. On or about December 2020, Defendants unilaterally announced that it would terminate all Former Agreements and all Plaintiffs who did not sign the New Agreement.

348. Plaintiffs' vehicles, which are used to transport Defendants' products have gross vehicle weight ratings or gross combination weight of ten thousand one pounds or more.

349. Defendant PCBCNY requires Plaintiffs to provide personally identifying information to issue Identification Cards to access PCBCNY premises.

350. Plaintiffs must use Defendant PCBCNY handheld computers (handhelds) to sell PCBCNY products at prices set by Defendants. Plaintiffs cannot commence work without the handheld, which is owned and maintained by Defendant PCBCNY. Plaintiffs cannot commence work, making deliveries, before the handheld is unlocked by an agent, employee, or representative of PCBCNY. If the handheld is lost, the Plaintiffs may be billed approximately $2,500. Defendants' handhelds track and monitor the sales of Defendants' products. Defendants' handhelds permit GPS tracking to locate Plaintiffs in the field.

351. Plaintiffs must purchase a designated territory in which they operate the distributorship and sell PCBCNY products. Plaintiffs distribute PCBCNY products (primarily

beverages) within territories, which they "purchased" from Defendant PCBCNY. In effect, Defendant PCBCNY holds itself out as controlling the rights to distribute its products in geographic regions where Plaintiffs operate.

352.    Plaintiffs work from Defendants' facilities (aka terminals, plants, or warehouses), which house their trucks and where agents of PCBCNY load each Plaintiff's truck each day. Plaintiffs must park their trucks on Defendant PCBCNY's property for the benefit of Defendant PCBCNY. Plaintiffs interact with other of Defendants' personnel daily. Plaintiffs have offices on Defendant PCBCNY's premises.

353.    Plaintiffs are unable to access their trucks to make deliveries when PCBCNY facilities are closed. If an insufficient number of distributors intend to make deliveries on Saturdays, Plaintiffs' trucks are inaccessible such that no deliveries are made.

354.    Plaintiffs are restricted in hiring drivers because drivers must be vetted by PCBCNY.

355.    Plaintiffs and class members provide services which are an integral part of Defendants' business enterprise, and Plaintiffs have no separate or distinct occupation or business.

356.    By providing vehicles with required PCBCNY logos, colors and advertising, by at least daily reporting to PCBCNY facilities, by interacting daily with PCBCNY's customers, by following PCBCNY's delivery methods, by providing PCBCNY with customer leads, by using PCBCNY handheld computers that enable PCBCNY to track sales and in other material ways, Plaintiffs and class members have rendered, and continue to render, services to Defendant PCBCNY which are integral to Defendant PCBCNY's sale and distribution system.

357.    Plaintiffs perform functions that are an essential and significant part of Defendants' normal business operations, and they do so under the direct supervision and control of the Defendants.

358.     Distribution of Defendant PCBCNY products is integral to Defendant PCBCNY's process of production.  In addition to requiring Plaintiffs to distribute PCBCNY products, Defendant PCBCNY operates its own distribution operations, using its own employees.  Defendant PCBCNY distributes soft drinks in territories in the State of New York.  Defendant PCBCNY employs drivers who distribute soft drinks in the State of New York.  Defendant PCBCNY has operated distribution routes for itself for more than one year.

359.     One or more Defendants, including Defendant REGINALD GOINS, determined that it is less expensive to designate Plaintiffs, as "independent contractors," than to employ them as "employees."

360.     As indicated herein, upon approval by Defendants, Plaintiffs buy and sell distributorships and the distributorships continues distributing products for Defendant PCBCNY without material changes.

361.     To commence work making deliveries, Plaintiffs must report the number of cases on his/her truck to one or more employees, agents, or checkers, from one or more Defendants, including Defendant PCBCNY.

362.     Defendants employ a variety of managerial and supervisory employees at their facilities who have supervisory responsibility over the Plaintiffs.  Defendants had, and have, the right to inspect and take inventory of the products in the Plaintiffs' possession.  Defendants have the authority to contact customers to evaluate satisfaction with distribution services.  Defendants dispatch inspectors to inspect customers' premises to evaluate the Plaintiffs deliveries to confirm that they conform to "corporate set" or specifications set by PCBCNY.  PCBCNY agents, servants, and/or employees inspect Plaintiffs' work by photographing customers' retail shelves stocked with PCBCNY products and provide reports that lead to reprimands of Plaintiffs who failed to comply with PCBCNY specifications or corporate set.

363.     Defendants evaluate Plaintiffs' job performance through "business reviews." Defendants have authority to require Plaintiffs to visit a certain number of customers per day. Defendants have authority to require Plaintiffs to review Plaintiffs' sales numbers and route books with a district sales manager.

364.     Defendants receive and respond to complaints by customers about Plaintiffs' work and may reprimand or terminate Plaintiffs in response to sufficiently serious complaints.

365.     Each Plaintiff must annually attest that the distributorship has not changed from the stock certificates that it submitted in the previous year's annual distributor certification.

366.     Plaintiffs are prohibited from transferring shares in distributorships without Defendants' permission.

367.     Plaintiffs are required to annually certify to one or more Defendants, including Defendant PCBCNY, that (s)he is not delinquent in tax obligations.  Defendant PCBCNY requires each Plaintiff / distributor to list it as a co-insured on its insurance policies or indemnify it in the event of a claim.

368.     Plaintiffs' incomes are monitored by Defendants.

369.     Plaintiffs work at the pleasure of Defendants and the duration of the relationship is without end, absent termination. Because Defendants retain unilateral control over contract interpretation and termination, the Agreement is an at-will employment relationship of indefinite duration.

370.     Plaintiffs are entirely economically dependent on Defendants.

371.     Plaintiffs must work exclusively for Defendants.  Plaintiffs can hold no job other than working for Defendants/PCBCNY and would be terminated if did so.  Plaintiffs are restricted from engaging in other employment while working a distributorship for Defendants. Plaintiffs are

restricted from working jobs that bear no relationship to soft drink sales and delivery, such as (for example) maintenance work or carpentry, while also working for Defendants.

372.    Plaintiffs are restricted from forming or owning any other businesses while working for Defendants.

373.    Plaintiffs are required to exclusively distribute Defendant PCBCNY products. Plaintiffs are not free to deliver competing brands of products such as Coca-Cola.  Plaintiffs are not permitted to work for Defendants' competitors.

374.    Plaintiffs' services are not available to the general public.

375.    Plaintiffs are not allowed to offer their sales or distribution services to the public.

376.    Plaintiffs' services are not available to those who are not parties to Distributor Agreement(s).

377.    Plaintiffs and their trucks bear all outward indicia of being PCBCNY employees because they are controlled by Defendants.  Plaintiffs' trucks must be, and are, painted with logos of Defendants PCBCNY brands.  Plaintiffs must wear uniforms that bear the Pepsi-Cola logo or a logo of a Pepsi-Cola products.  Defendants do not permit Plaintiffs to perform delivery work without wearing uniforms that meet Defendants' specifications and bear a Pepsi-Cola logo. Plaintiffs are restricted from delivering Defendants' products without wearing a uniform bearing a Pepsi-Cola or Pepsi-Cola brand logo. Plaintiffs are required to pay to launder the prescribed uniforms.

378.    Plaintiffs are required to present to customers as Defendant PCBCNY's agents by requiring Plaintiffs to operate vehicles painted with Defendant PCBCNY brand logos, requiring Plaintiffs to wear uniforms displaying Defendant PCBCNY brands logos, and using handheld devices which are the property of Defendant PCBCNY.

379.    Until approximately 2019, Defendant PCBCNY unilaterally decided to wash Plaintiffs' trucks.  After unilaterally deciding to wash Plaintiffs' trucks, Plaintiffs were billed for the

wash. Accordingly, PCBCNY controls Plaintiffs' appearances to customers. Plaintiffs had no control over when the washing bill would be received. Delayed billing made it difficult or impossible for Plaintiffs to determine if washes were given at all or to confirm the number of washes.

380.   Up to approximately 2018, Defendant PCBCNY unilaterally placed its advertisements on Plaintiffs' trucks and refused to pay Plaintiffs for use of the advertising space. Such advertisements have included, but not been limited to, advertisements to attract employees to work for Defendant PCBCNY. Such advertisements have also included, but were not limited to, promotions for new Pepsi products.

381.   Plaintiffs must promote Defendants' products exclusively.

382.   Defendant PCBCNY restricts Plaintiffs from forming partnerships of 50% - 50% shareholding in one or more Plaintiffs' distributorship companies. Defendant PCBCNY and one or more other Defendants restrict Plaintiffs from transferring 50% or more of the shares of their distributorship companies. Defendant PCBCNY and one or more other Defendants must approve any transfer of shares in Plaintiffs' distributorship companies. Defendant PCBCNY and one or more other Defendants refuse to allow one or more Plaintiffs to sell portions of their distributorships to subordinate distributorships.

383.   Defendants retain the right to control the manner and means by which Plaintiffs perform their jobs.

384.   Defendants control Plaintiffs' work schedules in myriad ways. Plaintiffs were hired to timely pick up and deliver Defendants' products at times, locations, and for amounts determined by Defendants. Defendants retain the right to control the delivery and/or pick up times and thus control drivers' work hours. Plaintiffs must submit loading diagrams at times specified by Defendant PCBCNY. Defendants control the times when Plaintiffs' trucks are loaded and thus

further control Plaintiffs' work hours. When Defendants' premises are closed on holidays, Plaintiffs cannot otherwise work and cannot even access their trucks which are parked on Defendants' premises. Defendants retain the right to control when Plaintiffs may leave the PCBCNY facilities with PCBCNY products for delivery each day and retain control over the release of handhelds. If a business with a "national account" such as Walgreens, places an order for Defendants' products; then Defendants can unilaterally change the Plaintiffs' schedule to make deliveries.

385.   Plaintiffs are restricted from rejecting customers whose deliveries are excessively time consuming or costly.

386.   Defendants can impose penalties for a Plaintiffs' failure to comply with Defendants' policies. When Plaintiffs work in a way that one or more Defendants deems improper, Defendants issue a warning, punishment, reprimand, or other penalty and retain documentation of the same.

387.   Defendants periodically distribute memoranda from management covering various topics including delivery procedures, news regarding growth and new products, and similar information. Defendants train Plaintiffs in how to promote Defendants' products.

388.   Defendants set Plaintiffs' pay rates by controlling the purchase and sale prices of products that Plaintiffs sell and deliver.

389.   Defendant PCBCNY can limit the number of products that one or more Plaintiffs can sell. On or about July 22, 2021, Plaintiffs / distributors were notified that approval from one or more Defendants was required to load more than fifty (50) cases of Gatorade 20 oz bottles.

390.   Defendants unilaterally set the compensation to be paid to the Plaintiffs by controlling the prices and costs of PCBCNY products that Plaintiffs must sell. Defendants unilaterally set the prices charged to their customers for the services rendered by Plaintiffs and class members.

391.     Plaintiffs pay Defendants for costs of the products which were sold.  Defendants have complete control over the prices that retailers pay for Defendants' products.  Defendants completely control the costs that Plaintiffs must pay Defendants for the PCBCNY products. Defendants restrict Plaintiffs from selling Defendants' products for any price other than what Defendants designate.  Plaintiffs cannot change the price of any of Defendants' product which Plaintiffs sell to retailers.  Plaintiffs lack authority to sell Defendants' product at a different price than that which is set by Defendants.  Defendants exercise total control over the cost that Plaintiffs must pay for the products they obtained from Defendants.

392.     Plaintiffs cannot sell his/her distributorship without Defendants' approval of the purchaser.  Plaintiffs and prospective purchasers of a distributorship must undergo a background check before purchasing a distributorship from Defendants.  Plaintiffs must undergo a general background check before purchasing a distributorship from Defendants.  Defendants must interview any person who wishes to purchase a distributorship from a Plaintiff.  Defendants have complete authority to reject a Plaintiffs' proposed sale of his/her distributorship.  Defendants can reject the sale of a distributorship to pressure that Plaintiff or to enter into a revised distribution agreement.

393.     Defendants have power to control Plaintiffs' trucks.  One or more Defendants has authority to require that Plaintiffs' trucks on Defendant PCBCNY property be used in Plaintiffs' day-to-day business operations.  Defendants require that Plaintiffs' trucks on Defendant PCBCNY property be kept in working order.  Defendants require that Plaintiffs' trucks on Defendant PCBCNY property have valid front and rear license plates.  Defendants require that Plaintiffs' trucks on Defendant PCBCNY property be fully insured.  Defendants require that Plaintiffs' trucks on Defendant PCBCNY property have a non-expired vehicle registration.

394. Plaintiffs are required to carry workers compensation insurance. Plaintiffs must identify the name and title of each driver that Plaintiff works with who accesses PCBCNY property.

395. Plaintiffs are required to build specialized displays in retail stores. One or more Plaintiffs were required to build an artful display in a retail store in connection with Superbowl season.

396. The work of distributing Defendant PCBCNY's products is an integral part of Defendant PCBCNY's business.

397. Distribution services are within the usual course of Defendant PCBCNY's business.

398. Defendant PCBCNY distributes PCBCNY products itself and through its employees, without the aid of independent contractors, such as Plaintiffs.

399. Defendant PCBCNY is in the sales and distribution business, similar to Plaintiffs.

400. If Defendants terminate the Former Agreement or New Agreement, then Defendants effectively cancel or destroy the Plaintiffs' distributorships. Upon termination of the Distributorship Agreement, the Plaintiff can no longer sell or deliver PCBCNY products and ceases to operate.

401. Defendants can cancel or destroy the Plaintiffs' distributorship upon cancellation or severance of the Distributor Agreement.

402. Upon the death of the owner of a distributorship, the distributorship ceases to exist and Defendant PCBCNY can refuse to recognize it as existing.

403. When the owner of a distributorship passes away, (s)he cannot freely bequeath the distributorship to an heir or relative without one or more Defendants' approval and authorization. For example, ALAN WALDER is a former operator of a distributorship who is now deceased. ALAN WALDER was married to Plaintiff MERYL WALDER who is the executor of decedent ALAN WALDER's estate. Upon ALAN WALDER's death, MERYL WALDER was refused the

opportunity to continue her deceased husband ALAN WALDER's distributorship. Defendant PCBCNY, and its Transfer Committee refused MERYL WALDER the opportunity to sell ALAN WALDER's route to a buyer who would have paid approximately $3.25 per case for the route. Defendant PCBCNY and its Transfer Committee refused MERYL WALDER the opportunity to sell ALAN WALDER's distributorship for any higher price than approximately $2 per case. Plaintiff MERYL WALDER was not offered the New Agreement to operate the distributorship that was operated by decedent ALAN WALDER.

404.    Defendants must approve any driver or assistant who works with Plaintiff and who enters Defendant PCBCNY's premises. Defendants may terminate Plaintiffs' Distributor Agreements based on the actions of those who assist Plaintiffs.

405.    Plaintiffs do not act upon or otherwise exercise independent judgment in the performance of their duties for Defendants.  In many instances, Defendants explicitly prohibit Plaintiffs from exercising independent judgment in the performance of their duties for Defendants.

406.    Defendants treated Plaintiffs like employees.  For example, upon information and belief, Plaintiffs were eligible for "employee discounts" at golf courses.  Upon information and belief, Plaintiffs were eligible for "employee discounts" at a car wash.  One or more Defendants, including Defendant PCBCNY, coordinated competitions between warehouses that encouraged one or more Plaintiffs to compete to sell and deliver more products.

407.    Upon information and belief, Defendant PCBCNY provides wages and benefits, including retirement, health, pension, sick and holiday pay, and expense reimbursement benefits, to certain of its employees, including but not limited to those employees who market, service, and distribute products to Defendants' so-called "territories" outside of the five boroughs of New York City as well as loaders and other unionized employees, including but not limited to Teamsters Union Local 812 members who are employed by Defendant PCBCNY.  Defendants do not provide such

benefits to the Plaintiffs since they were misclassified as "independent."  Had they not been
misclassified; Plaintiffs would have benefited under the same or substantially similar employment
agreements.

408.    Defendants failed and refused to contribute to workers' compensation insurance
programs.  Defendants do not allow Plaintiffs to apply or qualify for workers' compensation
benefits, although they are legally entitled to such benefits, as employees.  Defendants failed and
refused to contribute to unemployment insurance programs for Plaintiffs.  Defendants refuse to
allow Plaintiffs to apply or qualify for unemployment benefits, although they are legally entitled to
such benefits, as employees.  Such costs of insurance (general liability, auto, umbrella, and other
types) were approximately $12,500 per year and subject to change and further individualization).

409.    Defendants have intentionally misclassified the Plaintiffs as "independent agents" to
avoid providing the same wages and benefits that they provide to their other PCBCNY employees.

410.    One or more Plaintiffs was required to sign the New Agreements on or about
December 23, 2020.

411.    Plaintiffs MICHAEL ASHTON, VINCENT CARREIRI, ROBERT ELISEO,
JOSEPH DISTASI, STEPHEN MARTIN, KIRK RODRIGUEZ, THOMAS LEGOTTE,
LEONARD CARLO, MIGUEL MIELES, and STEVEN WEIDLER were required to sign the
"New" Contract on or about December 23, 2020.

412.    Defendants failed or refused to provide Plaintiffs with wage notices as prescribed in
NYLL § 195(1).

413.    Defendants failed or refused to provide Plaintiffs with wage statements as prescribed
in NYLL § 195(3).

414.    NYLL § 195(4) requires every employer to establish and maintain, for at least six years, inter alia, payroll records showing the hours worked, gross wages, deductions, and net wages for each employee.

415.    NYLL § 661 requires every employer to maintain, inter alia, true, and accurate records of hours worked by each employee covered by an hourly minimum wage rate, and the wages paid to all employees.

416.    Defendants did not, and still do not, maintain and preserve complete and accurate payroll records for all Plaintiffs.

417.    Defendants violated NYLL §§ 195(4), 661 and 12 N.Y.C.R.R. § 142- 2.6 by failing to maintain required records.

418.    Defendants' failure to accurately make, keep, maintain, and preserve such records with respect to Plaintiffs is prejudicial to Plaintiffs and in violation of NYLL §§ 195(4) and 661.

## V.    **CLASS ALLEGATIONS**

419.    Plaintiffs bring the state law causes of action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons who work or have worked for Defendants as Drivers in New York between the date that is six years before the date this Complaint is filed and the date of final judgment in this matter (the "Class").

420.    One or more Defendants employ or employed, during the class period, more than 100 distributors in the State of New York, including, either presently or at material times in the past, each of the Plaintiffs and members of the Plaintiff class.  (20)

421.    During Plaintiffs' employment with Defendants, the Plaintiffs consistently worked over 40 hours per week.

422.    Defendants never paid overtime compensation to Plaintiffs.

423. Likewise, other FLSA Collective and Rule 23 Class members consistently worked over 40 hours per week and were not paid overtime compensation.

424. The persons in the Class identified above are so numerous that joinder of all members is impracticable.

425. Although the precise number of such persons is not known to the Plaintiffs, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

426. Upon information and belief, the size of the prospective Class exceeds 40 persons.

427. Upon information and belief, the size of the prospective Class exceeds 30 persons.

428. Upon information and belief, the size of the prospective Class exceeds 20 persons.

429. Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

430. The state law causes of action are properly maintainable as a class action under Federal Rule of Civil Procedure 23. There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members of the Class, including but not limited to:

A. whether Defendants violated NYLL ("NYLL"), Articles 6 and 19, and the supporting New York State Department of Labor regulations.

B. whether Defendants refused to pay Plaintiffs and the Class members overtime pay for hours worked in excess of 40 hours per workweek

C. whether Defendants failed to keep true and accurate time and pay records for all hours worked by Plaintiffs and the Class members, and other records required by the NYLL.

      D.     whether it was Defendants' policy or practice to make unlawful deductions from the wages of Plaintiffs and the Class.

      E.     whether it was Defendants' policy or practice to fail to furnish Plaintiffs and the Class with accurate wage notices listing, inter alias, rates paid, as required by the NYLL.

      F.     whether it was Defendants' policy or practice to fail to furnish Plaintiffs and the Class with accurate statements of wages, hours worked, rates paid, and gross and net wages as required by the NYLL.

      G.     whether Defendants' policy of failing to pay workers in accordance with New York law was instituted willfully or with reckless disregard of the law; and

      H.     the nature and extent of class-wide injury and the measure of damages for those injuries.

431.    Plaintiffs' claims are typical of the claims of the Class.

432.    Plaintiffs and the members of the Class work or have worked for Defendants and were subjected to their policy and pattern or practice of misclassifying them as independent agents/contractors and failing to pay overtime wages for hours worked more than 40 hours per week.

433.    Plaintiffs and the members of the Class have been subject to Defendants' policy and pattern or practice of failing to pay them overtime and making unlawful deductions to their pay.

434.    Plaintiffs and the Class members enjoy the same statutory rights under the NYLL to be paid for all hours worked, and to be paid overtime and "spread of hours" wages.

435.    Plaintiffs and the members of the Class all sustained similar types of damages because of Defendants' failure to comply with the NYLL.

436.     Plaintiffs and the members of the Class all have been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns.

437.     Defendants acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief with respect to the Class appropriate.

438.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

439.     Plaintiffs understand that, as the class representatives, they assume a fiduciary responsibility to the Class to represent its interests fairly and adequately.

440.     Plaintiffs recognize that as the class representatives, they must represent and consider the interests of the Class just as they would represent and consider their own interests.

441.     Plaintiffs understand that in decisions regarding the conduct of the litigation and its possible settlement, they must not favor they own interests over those of the Class.

442.     Plaintiffs recognize that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Class.

443.     Plaintiffs understand that to provide adequate representation, they must remain informed of developments in the litigation, cooperate with class counsel by providing them with information and any relevant documentary material in their possession, and testify, if required, in a deposition and in trial.

444.     Plaintiffs have retained counsel competent and experienced in complex class action employment litigation.

445.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation, particularly in the context of wage litigation like the present action, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate Defendant like PCBCNY.

446. The members of the Class have been damaged and are entitled to recovery because of Defendants' common and uniform policies, practices, and procedures.

447. Although the relative damages suffered by individual members of the Class are not de minimis, such damages are minor compared to the expense and burden of individual prosecution of this litigation.

448. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

## VI. COLLECTIVE ACTION ALLEGATIONS

449. Plaintiffs bring their FLSA minimum wage, overtime compensation, and liquidated damages claims as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all similarly situated persons (the "FLSA Collective members" or "members of the FLSA Collective"), i.e., persons who are or were employed by Defendants or any of them, on or after the date that is three years before the filing of the complaint in this case (the "FLSA Collective Period").

450. At all relevant times, Plaintiffs and other members of the FLSA Collective have been similarly situated in that they have had substantially similar job requirements and pay provisions, and have been subject to Defendant's common practices, policies, programs, procedures, protocols and plans including willfully failing and refusing to pay them the required minimum wage, overtime pay at a one and one-half their regular rates for work in excess of forty (40) hours per workweek under the FLSA, and willfully failing to keep records under the FLSA.

451. Plaintiffs and the other distributors are similarly situated in that they are all subject to Defendants' common plan or practice of designating them as independent agents/contractors (when in fact their work and the extent of control Defendants exerted over them rendered them employees), failing to pay them overtime compensation, requiring them to provide and maintain their own vehicles and fuel, and making unlawful deductions from their paychecks.

452.     This is an appropriate collective or representative action under 29 U.S.C. § 216(b).

## VII.    CAUSES OF ACTION

### A.    AS AND FOR A FIRST CAUSE OF ACTION - FLSA - Unpaid Minimum Wage

453.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

454.     At all relevant times, upon information and belief, Defendants were and continue to be engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 203(d), 206(a) and 207(a).

455.     Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 203(e), 203(g), 206(a) and 207(a).

456.     Within each of the three (3) most recent years relevant to the allegations herein, PCBCNY had gross revenues of more than $500,000.

457.     Plaintiffs were an enterprise engaged in commerce within the meaning of the FLSA for all relevant periods herein and the Plaintiffs were employed by the Defendants.

458.     Defendants PCBCNY, HAROLD HONICKMAN, REGINALD GOINS, WILLIAM W. WILSON, JEFFREY HONICKMAN, JOSEPH KLINGLER, SCOTT ALLMERS, and JOSEPH HAYES are "employers" within the meaning of U.S.C. §§ 203(d) and 206(a).

459.     Defendants were required to pay directly to plaintiffs and the FLSA Collective the applicable federal minimum wage rate for all hours worked.

460.     Plaintiffs are entitled to be paid at the rate of time and one-half of the "regular" rate for all hours worked more than forty (40) per week, as provided for in the FLSA, *see e.g.,* 29 U.S.C. § 207. Such calculation can and should be made for Plaintiffs by reference to the hourly wages paid to PCBCNY's other similarly situated employees and/or by reference to the regular rate of wages prevailing in the industry for similarly situated employees performing such services.

461.    Defendants failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA, 29 U.S.C. § 206.

462.    Defendants failed to pay Plaintiffs hourly wages paid to PCBCNY's other similarly situated employees or the regular rate of wages prevailing in the industry for similarly situated employees performing such services.

463.    Plaintiffs were required to bear the costs of, inter alia, and subject to approximation: hand trucks or power trucks (approximately $250 per year); phone (approximately $80/month); fuel (approximately $120/week); truck registration fuel (approximately $300/year); MV Tax stickers (approximately $300/year); (approximately HUD stickers (approximately $40/year); truck warranties (approximately $100/month); inspections (approximately $135/year); oil changes (approximately $1020/year); truck repairs (approximately $3000/year); parking tickets (approximately $600/month); parking meters (approximately $50/week); uniforms; costs of vending and refrigeration machine fees and costs (approximately $80 - $250/month).

464.    Defendants knowingly, willfully, and intentionally failed to compensate Plaintiffs at the applicable minimum hourly wage or indeed any wage, in violation of the FLSA, see e.g., 29 U.S.C. §206(a).

465.    Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs.

466.    Defendants failed to properly disclose or apprise Plaintiffs of their rights under the FLSA.

467.    Defendants are each jointly and severally liable for all damages arising from Defendants' violations of FSLA, including their failure to pay wages.

468.     As a direct and proximate result of Defendants' violation of the FLSA, Plaintiffs are entitled to payment of wages for all hours worked, plus liquidated damages pursuant to the FLSA.

469.     Due to the reckless, willful, and unlawful acts of the Defendants, Plaintiffs, and members of the FLSA Collective and Class suffered damages in an amount not presently ascertainable in the form of unpaid wages, and are entitled to recover from Defendants such wages, plus an equal amount as liquidated damages, pursuant to 29 U.S.C. §§ 206, 207, and 216(b).

470.     Plaintiffs are also entitled to an award of their reasonable attorneys' fees, costs, and expenses, including pre-judgment interest, pursuant to 29 U.S.C. § 216(b), all in an amount to be determined at trial.

### B.  AS AND FOR A SECOND CAUSE OF ACTION - FLSA - Unpaid Overtime

471.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

472.     Defendants are required to pay Plaintiffs and the FLSA Collective one and one-half (1½) times the regular rate of pay for all hours they worked more than forty (40) hours in a workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207, et seq.

473.     Defendants did not pay Plaintiffs and the FLSA Collective the overtime wages.

474.     Defendants had and continue to have a policy and practice of failing and refusing to pay any overtime compensation (whether at the "regular" rate of time and one half or otherwise) to Plaintiffs for all hours worked in excess of forty (40) hours per work week, which violated and continues to violate the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. §§ 206(a), 207(a)(1) and 215(a).

475.     In violation of the FLSA, Defendants willfully, knowingly, and intentionally refused to pay Plaintiffs overtime wages.

476.     Defendants knowingly, willfully, and intentionally failed to compensate Plaintiffs for overtime wages, in violation of the FLSA.

477.     Due to defendants' violations of the FLSA, Plaintiffs are entitled to recover their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

**C.  AS AND FOR A THIRD CAUSE OF ACTION - NYLL - Unpaid Minimum Wages**

478.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

479.     Defendants PCBCNY, HAROLD HONICKMAN, REGINALD GOINS, WILLIAM W. WILSON, JEFFREY HONICKMAN, JOSEPH KLINGLER, SCOTT ALLMERS, and JOSEPH HAYES are each "employers" and "agents" within the meaning of the NYLL §§ 190, 651(5), 652, and supporting New York State Department of Labor Regulations.

480.     Plaintiffs are each "employees" within the meaning of the NYLL §§ 190, 651(5), 652, and supporting New York State Department of Labor Regulations.

481.     The minimum wage provisions of Article 19 of the NYLL and the supporting New York State Department of Labor Regulations apply to defendants and protect the Plaintiffs.

482.     Plaintiffs are each entitled to compensation and benefits from the Defendants, including but not limited to benefits, "wages," and wage supplements within the meaning of the NYLL, see, e.g., NYLL §§ 190(1), 198-c (1) and (2).

483.     At all relevant times, Defendants were aware or should have known that they were required by New York law to pay Plaintiffs minimum wages for the hours worked each week, without deduction for the costs and expenses associated with their performance of services on behalf of Defendants.

484. Defendants required Plaintiffs to pay, without reimbursement, the costs, and expenses for purchasing and maintaining equipment and "tools of the trade" required to perform their jobs, further reducing his wages in violation of the FLSA and NYLL. 29 U.S.C. § 206(a); 29 C.F.R. § 531.35; N.Y. Lab. Law § § 193 and 198-b.

485. Plaintiffs were required to purchase each distributorship to work for Defendant PCBCNY.

486. Plaintiffs were required to bear the costs of tools of the trade listed at paragraph 465.

487. As a result of defendants' willful violations of the NYLL, plaintiffs and Class Members are entitled to recover unpaid wages, interest, reasonable attorneys' fees and costs of the action, and pre- judgment and post-judgment interest.

488. Plaintiffs are also entitled to recover liquidated damages from Defendants in an amount equal to 100% of unpaid wages owed to Plaintiffs, under the NYLL, see, e.g., NYLL §§ 191,193, 198 198(1-a), et. seq. and 12 NYCRR 142-2.1, in an amount to be determined at trial.

### D. AS AND FOR A FOURTH CAUSE OF ACTION - NYLL - Unpaid Overtime

489. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

490. Under the NYLL and supporting New York State Department of Labor Regulations, defendants were required to pay Plaintiffs and the FLSA Collective one and one (1½) half times the regular rate of pay for all hours they worked in excess of forty (40) hours in a workweek.

491. Defendants have failed to pay Plaintiffs and the Class the overtime wages to which they were entitled under the NYLL.

492. Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiffs and the Class overtime wages.

493.     Such calculation of unpaid overtime wages can and should be made by reference to the hourly wages paid to PCBCNY's other similarly situated employees and/or by reference to the regular rate of wages prevailing in the industry for similarly situated employees performing the same services.

494.     Due to defendants' willful violations of the NYLL, Plaintiffs are entitled to recover their unpaid overtime wages, reasonable attorneys' fees and costs of the action, liquidated damages and pre-judgment and post-judgment interest.

495.     Plaintiffs are entitled to liquidated damages, pre-judgment interest, and reasonable attorneys' fees for Defendants' violations of the NYLL §§ 160, 190 et seq. and 12 NYCRR § 142-2.2, in an amount to be determined at trial.

E.    **AS AND FOR A FIFTH CAUSE OF ACTION - NYLL - Unlawful Deductions / Failure to Pay Wages**

496.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

497.     At all relevant times, Defendants were employers of Plaintiffs within the meaning of the N.Y. Lab. Law § § 2 and 651.

498.     Defendants made unlawful deductions from wages due to Plaintiffs in the form of refusing to pay commissions for transportation of broken or spoiled products.

499.     The deductions made from wages owed to Plaintiffs were not authorized by law.

500.     Pursuant to N.Y. Lab. Law § 193, an employer may not make deductions from wages, except as set forth therein.

501.     Deductions that Defendants made from wages and commissions due to Plaintiffs were unlawful because they were not "made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency," N.Y. Lab. Law § 193(1)(a), "expressly authorized in writing by the employee and are for the benefit of the employee," N.Y. Lab. Law § 193(1)(b),

"related to recovery of an overpayment of wages where such overpayment is due to a mathematical or other clerical error by the employer," N.Y. Lab. Law § 193(1)(a), "expressly authorized in writing by the employee and are for the benefit of the employee," N.Y. Lab. Law § 193(1)(c), or "repayment of advances of salary or wages made by the employer to the employee," N.Y. Lab. Law § 193(1)(d).

502.     Because Defendants made unlawful deductions from wages which were rightfully owed to Plaintiffs, pursuant to N.Y. Lab. Law § 198(1-a), Defendants are liable to Plaintiffs for the unlawfully deducted wages, an equal amount in liquidated damages, attorney's fees, interest, and costs.

503.     Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover an amount prescribed by statute, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

504.     Through their knowing and intentional efforts to take unauthorized deductions from wages due to Plaintiffs, Defendants willfully violated NYLL, Article 6, § § 190 et seq., and supporting New York State regulations.

505.     Plaintiffs were damaged in an amount to be determined at trial.

### F.     AS AND FOR A SIXTH CAUSE OF ACTION - NYLL - Uniform Expenses

506.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

507.     Defendants required Plaintiffs to wear uniforms that were not composed of ordinary street clothing and did not permit variations in details of dress.

508.     Defendants prescribed a specific type and style of clothing to be worn at work.

509.     By failing to pay Plaintiffs for the maintenance of required uniforms, defendants have willfully violated the NYLL, and the supporting New York State Department of Labor Regulations.

510.     Defendants also unlawfully required Plaintiffs to launder and maintain their uniforms and failed to provide Plaintiffs with pay in addition to the minimum wage for these costs.

511.     Plaintiffs incurred costs purchasing and laundering the uniforms for the benefit and convenience of defendants.

512.     It was defendants' policy, and pattern or practice not to pay for the purchase or laundering of uniforms worn by Plaintiffs, not to reimburse them for these costs, and not to compensate them at all for these costs.

513.     Defendants' failure to reimburse Plaintiffs for the cost of purchasing and laundering these uniforms reduced wages owed to Plaintiffs to a level below the required minimum wage and overtime pay.

### G.  AS AND FOR A SEVENTH CAUSE OF ACTION - NYLL - Failure to Provide Wages and Benefits in Violation of NYLL § 198-c

514.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

515.     Benefits or wage supplements" are "wages" as defined in N.Y. Lab. Law § 190(1).

516.     NYLL § 198-c imposes on an employer the requirement to abide by the terms of the employer's agreement with its employees to provide them with any agreed-upon benefits. Once the employer agrees to provide benefits, it must abide by the terms of that agreement.

517.     Pursuant to N.Y. Lab. Law § 191(1)(c), Defendants were required to pay Plaintiffs "wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment ..."

518.     Workers compensation insurance that Defendants failed to provide Plaintiffs is a "benefit or wage supplement" as defined in NYLL § 198- c.

519.     Unemployment insurance that Defendants failed to provide Plaintiffs is a "benefit or wage supplement" as defined in NYLL § 198-c.

520. Sick time and vacation pay are benefits or wage supplements as defined in NYLL § 198- c.

521. N.Y. Lab. Law § 198-c(1) also provides a private right of action for civil liability. Excavators Union Local 731 Welfare Fund v. Zurmuhlen, 414 N.Y.S.2d 140, 142 (N.Y. App. Div 1979).

522. Upon information and belief, Plaintiffs would have been subject to an agreement providing for the provision of benefits available under NYLL § 198- c, but for Defendants' misclassification of them as "independent contractors," such as the agreement between PCBCNY and other members of Teamsters Union Local 812 and other "in-house" distributors employed by PCBCNY.

523. Pursuant to N.Y. Lab. Law § 198(3), Plaintiffs are entitled to recover all wages and liquidated damages accrued within six years before the commencement of this action which they would have received pursuant to agreements that Defendants had (upon information and belief) with their other employees, including but not limited to other members of Teamsters Union Local 812, but for Defendants' misclassification of them as "independent contractors" as opposed to employees.

524. Defendants are liable to Plaintiffs for the value of the insurance, an equal amount in liquidated damages, prejudgment interest, and attorneys' fees.

## H. AS AND FOR A EIGHTH CAUSE OF ACTION - New York Notice Requirements, N.Y. Lab. L. §§ 195(1), 198

525. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

526. The NYLL and Wage Theft Prevention Act ("WTPA"), as well as the NYLL's interpretative regulations, such as but not limited to 12 N.Y.C.R.R. Part 142, require employers to

provide all employees with a written notice of wage rates at the time of hire and whenever there is a change to an employee's rate of pay.

527.    In violation of NYLL § 195(1), Defendants failed to furnish Plaintiff with wage notices containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with NYLL § 195(1); the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer, and anything otherwise required by law.

528.    Due to Defendants' violation of NYLL § 195(1), Plaintiffs are entitled to recover from Defendants statutory damages and reasonable attorneys' fees and costs pursuant to the NYLL § 198(1-b).

## I.    AS AND FOR A NINTH CAUSE OF ACTION - New York Notice Requirements, N.Y. Lab. L. §§ 195(3), 198

529.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

530.    The NYLL and WTPA require employers to provide employees with an accurate wage statement each time they are paid.

531.    Throughout Plaintiff's employment, Defendants paid Plaintiff without providing a wage statement at the end of every pay period accurately listing, inter alia: the overtime rate or rates of pay; the number of regular and overtime hours worked per pay period; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages in violation of the NYLL § 195(3).

532.     Due to Defendants' violation of NYLL § 195(3), Plaintiffs are entitled to recover from Defendants liquidated damages and reasonable attorneys' fees and costs pursuant to the NYLL § 198(1-d).

**J.   AS AND FOR AN TENTH CAUSE OF ACTION - NYLL - Spread of Hours Violations, N.Y. Lab. L. §§ 650 et seq., N.Y. Comp. Code R. & Regs. tit. 12, § 142-2.4**

533.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

534.     Plaintiffs regularly had workdays that lasted more than ten (10) hours.

535.     Defendants willfully and intentionally failed to pay Plaintiffs one hour's pay at the full New York minimum hourly wage rate when their workdays exceeded ten (10) hours, as required by New York law, i.e., "spread of hours" compensation.

536.     By failing to pay Plaintiff spread-of-hours pay, Defendants willfully violated NYLL Article 19, §§ 650, et seq., and the supporting NYDOL regulations.

537.     Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover an amount prescribed by statue, reasonable attorneys' fees and costs of the action, pre- and post-judgement interest, and liquidated damages.

**K.   AS AND FOR AN ELEVENTH CAUSE OF ACTION - Unjust Enrichment**

538.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

539.     As a result of Defendants' misclassification of Plaintiffs as independent agents, Defendants forced Plaintiffs to bear the normal costs and incidents of PCBCNY's business and thus unjustly enriched themselves, to the detriment of Plaintiffs, in violation of the common law of New York State.

540.     As a direct and proximate result of Defendants' conduct, PCBCNY received substantial benefits to which it had no entitlement, at the expense of Plaintiffs, including but not limited to increased profits, decreased employment taxes, decreased premiums for workers' compensation and disability benefits, fewer business expenses, and the like.

541.     Allowing Defendants to keep and retain these substantial benefits would be unjust, unfair, and inequitable under the circumstances.

542.     As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiffs suffered and continue to suffer substantial losses, for which they are entitled to recover compensatory damages in an amount to be determined at trial.

### L.    AS AND FOR A THIRTEENTH CAUSE OF ACTION - New York Franchise Act -NYGBL Article 33 and 13 NYCRR Part 200

543.     Plaintiffs and members of the Class reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

544.     If Plaintiffs and members of the Class are not deemed to be "employees" of Defendants, then at the very least their purchase of distributorship routes constitute the purchase of "franchises," within the meaning of the FTC Franchise Rule, 16 CFR Parts 436, 437m and Section 681 of New York's Franchise Act (NYGBL Article 33).

545.     Pursuant to the Distributor Agreements, Plaintiffs, and members of the Class were purportedly granted the right to engage in the business of offering, selling, or distributing goods or services under PCBCNY's marketing plan or system, which is prescribed, in substantial part, by PCBCNY.

546.     The Distributor Agreements also granted Plaintiffs and members of the Class the right to engage in the business of offering, selling, or distributing goods or services that are substantially associated with PCBCNY's trademark, service mark, trade name, logotype, or advertising.

547.     Moreover, Plaintiffs and members of the Class were required to provide a "franchise fee," in the form of the purchase price of the route. NYGBL § 681(7).

548.     Thus, if not "employees," Plaintiffs and members of the Class must at least be treated as "franchisees," entitled to the protections and remedies available under New York's Franchise Act (NY GBL Article 33).

549.     If not an "employer" of Plaintiffs and members of the Class, PCBCNY must at least be deemed a "franchisor," within the meaning of NYGBL § 681(3), (4), and (5).

550.     Upon information and belief, contrary to the express requirements of the Franchise Act, Defendants have never filed an offering prospectus with the department of law in New York State, nor did they ever file a registration on forms prescribed by the department, nor did they provide Plaintiffs and members of the Class with any of the detailed disclosures and accompanying documents required by GBL § 683(1) through (7), either before Plaintiffs' acquisition of their respective PCBCNY routes through execution of the Distributor Agreements, or at any time thereafter.

551.     Upon changing the terms and conditions of their relationship with Plaintiffs and members of the Class, Defendants likewise failed to provide or file with the department of law or to provide to Plaintiffs and members of the Class any advance or even contemporaneous notice of such changes or amendments, as they were required to do pursuant to GBL § 683(9).

552.     Defendants offered to sell and did sell the PCBCNY franchises to Plaintiffs and members of the Class in a manner that wholly disregarded and failed to comply with the formal registration, disclosure, and offering requirements set forth in the Franchise Act, including GLB §683 (1) through (7), (11) and (13) – and such failures are ongoing and continue to date.

553.     Defendants also have wholly failed to comply with the recordkeeping, accounting, and filing requirements set forth in § 683(14) – and such failures are ongoing and continue to date.

554.     Defendants are not exempt from the requirements of the Franchise Act under GBL § 684.

555.     In failing to comply with any of the minimum requirements of the Franchise Act and entering into Distributor Agreements that were and continue to be illusory, adhesive, unprofitable, and unduly burdensome on Plaintiffs and members of the Class, Defendants employed – and continue to date to employ – a "device, scheme, or artifice to defraud" Plaintiffs. GBL § 687(2)(a) and (c).

556.     In conspicuously failing to disclose or recognize the true nature of the transactions as the sale of a franchise subject to the Franchise Act, Defendants have also willfully, deceptively, and fraudulently misrepresented and concealed their duties and obligations under the Franchise Act and Plaintiffs' corresponding rights and remedies. Their fraudulent misrepresentations and deceptive practices continue to date.

557.     Moreover, in conducting their business operations in the manner described herein so as to burden Plaintiffs with the heavy costs and expenses of performing services for PCBCNY, while unduly restricting, limiting, and controlling Plaintiffs' ability to act independently to earn a profit and maximize the returns on their franchise investments, Defendants engaged and continue to engage in an "act, practice, or course of business which operates as a fraud or deceit" upon Plaintiffs and members of the Class, in violation of GBL § 687(2)(a) and (c).

558.     PCBCNY and the individually named Defendants are jointly and severally liable for the above-referenced violations of the Franchise Act, under GBL § 691(3), in as much as each of the individually named Defendants is a principal, officer, or director of PCBCNY (or performs similar management and supervisory functions), and each materially aided in the acts or transactions constituting the violations.

559.    As a result of Defendants' willful and material violations of the Franchise Act, many of which are ongoing, Plaintiffs are entitled to recover their actual damages and to rescind their purchases of the PCBCNY franchises, so as recover the amounts paid for the franchises, plus interest at 6%. Plaintiffs and members of the Class are also entitled to recover their attorneys' fees and court costs. GBL § 691(1).

## VIII.    RELIEF REQUESTED

**WHEREFORE**, Plaintiffs, on behalf of themselves and on behalf of the FLSA Collective Plaintiffs and Rule 23 Class, pray for judgment against Defendants, jointly and severally, as follows:

A.    Authorizing Plaintiffs at the earliest possible time to give notice of this collective action, or that the Court issue such notice, to all persons who are presently, or have up through the extent allowable under the statute of limitations and including the date of issuance of court-supervised notice, been employed by Defendants as non-exempt employees, or as supposed independent agents/contractors. Such notice shall inform them that the civil notice has been filed, of the nature of the action, of their right to join this lawsuit of they believe they were denied premium overtime wages.

B.    Certification of this case as a collective action pursuant to FLSA.

C.    Issuance of notice pursuant to 29 U.S.C. § 216 (b) to all similarly situated members of the FLSA Collective and Class.

D.     FLSA opt-in class, apprising them of the pendency of this action, and permitting them to assert timely FLSA claims and state claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216 (b), and appointing Plaintiffs and their counsel to represent the Collective Action Members.

E.    Actual compensatory damages to Plaintiffs to the full extent permitted by law.

F.      A judgment in favor of Plaintiffs for all statutory penalties and liquidated damages allowed by law.

G.      Award of prejudgment interest to Plaintiffs.

H.      Award of injunctive relief enjoining and directing the Defendants to reclassify Plaintiffs as employees, to keep and preserve appropriate wage and employment records and comply with all applicable wage/notice requirements, and to provide Plaintiffs with all applicable wages, benefits, and wage supplements on a going-forward basis.

I.      Award of judgment rescinding the Distributor Agreements and awarding restitution compensating Plaintiffs for the amounts they paid for the illusory Distributor Agreements and for the reasonable value of the benefits provided by Plaintiffs to Defendants.

J.      Declaring that the Defendants' acts described in this Complaint constitute violations of the NYLL, New York common law, and the federal Fair Labor Standards act, or alternatively, the New York Franchise Act.

K.      Award of punitive damages in an amount to be determined at trial.

L.       Attorneys' fees and costs as provided by law; and

M.      Such other and further relief as the Court may deem just and equitable

## IX.    **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) and 38(c) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact.

Dated: Astoria, New York
           February 9, 2022

SACCO & FILLAS, LLP
Attorneys for Plaintiffs, proposed FLSA
Collective and potential Rule 23 Class

*/s/ Clifford R. Tucker*
Clifford R. Tucker, Esq., (CT-0206)
Patricia R. Lynch (PL-8436)
Luigi Brandimarte, Esq.